# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHRISTOPHER J. TIGANI, Sr., and JLT his minor child, CHRISTOPHER J. TIGANI, Jr., ROBERT F. TIGANI, Jr., and GFT his minor child, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0786-KSJM |
| | ) | |
| ROBERT F. TIGANI, Sr., Trustee and Individually, | ) ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| N.K.S. DISTRIBUTORS, INC., a Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 17, 2020
Date Decided: March 30, 2021

Christopher J. Tigani, Sr., Wilmington, Delaware; *Pro Se*.

John G. Harris, BERGER HARRIS LLP, Wilmington, Delaware; *Counsel for Plaintiffs Robert F. Tigani, Jr., Christopher J. Tigani, Jr., and minor children JLT and GFT*.

T. Brad Davey, Daniel M. Rusk, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendant Robert F. Tigani, Sr.*

Stephen B. Brauerman, Brett M. McCartney, Elizabeth A. Powers, BAYARD, P.A., Wilmington, Delaware; *Counsel for Nominal Defendant N.K.S. Distributors, Inc.*

**McCORMICK, V.C.**

Few activities imperil familial harmony more than the transfer of generational wealth, as this intra-family dispute over trust instruments illustrates. Defendant Robert F. Tigani, or "Bob" as he is known to his family, is accused by his biological sons and grandchildren of breaching his fiduciary obligations as trustee of the "1986 Trust." The 1986 Trust holds stock in the nominal defendant, N.K.S. Distributors, Inc. ("NKS" or the "Company"), an alcohol distribution business that has been operated and majority owned by the Tigani family since Bob's parents formed the Company in 1950.

The plaintiffs' primary complaint concerns a 2012 transaction, where NKS issued Bob seventy-five shares of common stock in exchange for $2.5 million. The plaintiffs advance an unhappy and baseless theory, alleging that the stock issuance was a self-dealing transaction designed to facilitate the transfer of control of NKS from the 1986 Trust, which Bob's biological heirs must inherit, to Bob's "new" wife and her children. In reality, the Company was in dire financial straits, the $2.5 million capital infusion was a necessary condition to refinancing, and Bob stepped up to the plate to make it happen. The challenged stock issuance was made after the capital infusion, without input from Bob, to address accounting issues raised by the Company's auditor. Ultimately, the Company repurchased the seventy-five shares at a bargain price for the Company. These facts do not support a finding that Bob breached his obligations as trustee.

The plaintiffs also claim that Bob breached his duties as trustee of another family trust, the "BST Trust," by using trust principal to buy a residence in Florida and a private plane. As to those claims, this decision enters judgment in the plaintiffs' favor.

## I.  FACTUAL BACKGROUND

Trial took place over three days in February 2020.  As reflected in the Schedule of Evidence, the record comprises 1,127 trial exhibits, live testimony from nine fact and two expert witnesses, deposition testimony from eleven fact and one expert witness, and 109 stipulations of fact.[1]  These are the facts as the court finds them after trial.

### A.  The Family

This case involves the descendants of James V. Tigani, Sr. and his wife, Betty S. Tigani, whom their family affectionately called "Pal"[2] and "Mimi"[3] (together, the "Settlors").  Pal and Mimi's two children are Robert F. Tigani, Sr. ("Bob," and together with NKS, "Defendants") and his older brother, James V. Tigani, II ("Jimmy").[4]  The plaintiffs are Bob's two sons, Christopher J. Tigani, Sr. ("Chris") and Robert F. Tigani, Jr. ("Bobby"), and their children (collectively, "Plaintiffs").  Chris and Bobby are Pal and Mimi's only biological grandchildren.[5]

---

[1] *See* C.A. No. 2017-0786-KSJM, Docket ("Dkt.") 460, Schedule of Evid.  This decision cites to:  trial exhibits (by "JX" number); the trial transcript (Dkts. 441–43) ("Trial Tr."); stipulated facts set forth in the Parties' Joint Pre-trial Stipulation and Order (Dkts. 437) ("PTO"); and deposition transcripts (by the deponent's name and "Dep. Tr." page and line).  Of the eleven trial witnesses, one, Linda Collins, was introduced exclusively through video recording of her deposition.  Trial Tr. at 5:6–8 (Collins).

[2] Because this matter involves a familial dispute, this decision refers to many of the parties by their first names or nicknames.  The court intends no disrespect.

[3] PTO ¶ 14; *see* Trial Tr. at 7:1–11 (Collins).

[4] PTO ¶¶ 15–17.

[5] *Id.* ¶¶ 10–12.

## B. The Family Business

Pal and Mimi founded nominal defendant NKS in 1950.[6] NKS, a Delaware corporation, is a wholesaler of alcoholic beverages with exclusive rights to distribute several beer brands throughout Delaware.[7]

Members of the Tigani family have always controlled all voting shares of NKS stock.[8] Pal and Mimi initially granted Bob and Jimmy equal ownership interests in NKS, but the brothers split the Company in 1999, with Jimmy spinning off the wine and spirits distribution division.[9] Bob, who began working for NKS after graduating from college in 1968, is currently NKS's CEO and Chairman of the NKS Board of Directors (the "Board").[10]

For generations, NKS's most critical business relationship has been with nonparty supplier Anheuser-Busch, Inc. ("Anheuser-Busch").[11] NKS is the exclusive wholesale distributor of Anheuser-Busch products in Delaware.[12] Anheuser-Busch requires its wholesalers to execute equity agreements.[13]

---

[6] *Id.* ¶ 14.

[7] *Id.*

[8] JX-985; JX-740.

[9] PTO ¶ 32.

[10] Trial Tr. at 506:6–10, 508:3–5 (Bob).

[11] *See id.* at 88:4–9, 133:1–3 (Chris); *id.* at 266:8–9 (Ruggiero); *id.* at 507:22–23 (Bob).

[12] JX-25 § 1(a) ("Anheuser-Bush hereby appoints [NKS] as the wholesale distributor of . . . the Products in the territory . . . and agrees that it will not appoint another wholesaler for the Products sold by [NKS] in the Territory."); *see also* JX-28 at 1.

[13] *See* Trial Tr. at 136:9–15 (Chris).

NKS's equity agreement with Anheuser-Busch (the "Anheuser-Busch Equity Agreement") requires that NKS designate an employee to manage its relationship with Anheuser-Busch, and requires that the designated employee hold a minimum amount of Company stock.[14]  The agreement also requires that NKS seek Anheuser-Busch's approval on change of control transactions.[15]  The agreement further grants Anheuser-Busch the right to terminate the agreement with NKS in the event of "the insolvency of [NKS] or [NKS's] failure to pay for Anheuser-Busch Products in accordance with approved terms."[16]

## C.     The Family Trusts

Pal and Mimi formed two trusts at issue in this litigation:  the Irrevocable Trust for the Benefit of Robert F. Tigani (the 1986 Trust) and the Revocable Trust of Betty S. Tigani, which was restated on August 16, 1988 (the BST Trust).[17]

### 1.     The 1986 Trust

Pal and Mimi executed the 1986 Trust on December 16, 1986, to hold shares of NKS stock in trust for Bob.[18]  Pal and Mimi's intent when forming the 1986 Trust features prominently in Plaintiffs' litigation themes.  The trial and deposition testimony reflect that Pal wanted NKS to remain a family-run business after his passing.  More specifically, he

---

[14] JX-25 §§ 2–3; Bob Dep. Tr. at 579:16–580:5; *see also* Trial Tr. at 433:9–434:15 (Director).

[15] JX-25 § 4.

[16] *Id.* § 6(a).

[17] JX-17 (the 1986 Trust); JX-22 (the BST Trust); Trial Tr. at 12:12–13:15 (Collins).

[18] 1986 Trust.

4

hoped that that his natural-born sons and grandsons would maintain control of NKS.[19]  In Bob's words, Pal ran NKS with an "old-school Italian" philosophy—he did not allow female relatives, sons-in-law, or step-children to work in the business.[20]  In fact, "the only ones he would allow to work in the business were . . . natural born sons," and only those natural born sons could inherit the Company under Pal's worldview.[21]

Pal initially sought to accomplish his goal by gifting Bob and Jimmy NKS stock directly, but he later changed course and placed NKS stock in family trusts.  The change in course was prompted by Bob's divorce and second marriage.  Pal formed the 1986 Trust as a means of ensuring that his wealth would flow to his biological heirs only and not to Bob's so-called "new" wife or her children.[22]  As Bob explained:  "[Pal] did not want [Bob's] two stepsons to work in the business, . . . [and] he did not want his daughter-in-law of a second marriage to have anything to do with it.  He was very protective of the business and . . . who would inherit [it]."[23]

Initially, the 1986 Trust's sole asset was 13 of the 250 outstanding shares of NKS stock.[24]  At the time the trust was formed, Pal, Jimmy, and Bob held the other NKS shares.[25]  Pal continued gifting NKS stock to the 1986 Trust in the years after the trust's

---

[19] Trial Tr. at 599:13–600:22 (Bob).

[20] Bob Dep. Tr. at 361:14–19.

[21] *Id.* at 361:19–20, 534:5–21.

[22] *See infra* note 133; Trial Tr. at 602:17–603:3 (Bob).

[23] Bob Dep. Tr. at 361:21–362:2.

[24] 1986 Trust Schedule A.

[25] PTO ¶ 23.

formation.[26] With each issuance to the 1986 Trust, Pal gave matching gifts of NKS stock directly to Jimmy.[27] Bob also personally owned 53 shares of NKS stock, which he transferred to a separate trust on May 1, 1989.[28]

As of May 1989, NKS had 250 outstanding shares split among three stockholders: (i) Jimmy owned 125 shares, or 50% of NKS's stock, (ii) Bob's personal trust owned 53 shares, or 21.2% of NKS's stock, and (iii) the 1986 Trust owned 72 shares, or 28.8% of NKS's stock.[29] Bob was trustee and beneficiary of both his own trust and the 1986 Trust, which collectively held 50% of NKS's outstanding stock. Voting power over NKS was thus evenly split between Jimmy and Bob.

As a result of Bob and Jimmy's business divorce in 1999,[30] Bob and the 1986 Trust became the sole stockholders of NKS. The 1986 Trust held 72 shares or 57.6% of NKS's voting common stock,[31] and Bob's trust held 53 shares or 42.4% of NKS's voting common stock.[32]

The few provisions of the 1986 Trust relevant to this litigation are summarized below.

---

[26] *Id.* ¶¶ 24, 27, 28, 30.

[27] *Id.* ¶¶ 24, 27–28.

[28] *Id.* ¶ 29.

[29] *Id.* ¶ 30.

[30] *See id.* ¶ 32.

[31] *Id.* ¶ 33.

[32] *Id.*

The 1986 Trust appoints Jimmy as Bob's successor trustee,[33] but Article Two of the 1986 Trust gives Bob the power to designate successor trustees should Jimmy "fail[] to qualify or cease[] to act."[34]

The 1986 Trust designates Bob as the current income beneficiary. Article Four of the 1986 Trust provides that, during his life,[35] Bob is entitled to all trust income and may draw up to $5,000 and five percent of trust principal annually (the "5-and-5 Power").[36]

The 1986 Trust gives Bob the right to invade trust principal, but only where necessary to provide for his "health, education, maintenance and support" as an income beneficiary.[37]

The 1986 Trust allows Bob to dictate the disposition of trust principal upon his death through his will or other written instrument, but only to the extent it devises the remaining trust principal to Chris or Bobby or their issue.[38] Article Four of the 1986 Trust provides that, upon Bob's passing, "the then-remaining amount of principal shall be distributed in such proportions and in such manner as [Bob] shall have appointed . . . provided, that this power may only be exercised in favor of [Bobby], or [Chris], and/or [their] issue."[39]

---

[33] 1986 Trust Art. 2 ¶ A.

[34] *Id.*

[35] *Id.* Art. 4.

[36] *Id.* Art. 4 ¶¶ A–B.

[37] *Id.* Art. 6.

[38] *Id.* Art. 4 ¶ E (allowing Bob to distribute trust principal "by specific reference to this power of appointment, in a writing delivered to the trustee, or, in default of such writing, by his duly probated will").

[39] *Id.*

Should Bob pass without having exercised his Article Four power, Article Five of the 1986 Trust provides that the "trustee shall divide the then-remaining amount of principal into equal shares" for Chris and Bobby, establishing separate trusts from which they are entitled both income and principal distributions.[40] In the alternative, "[i]n default of all [other] takers," the 1986 Trust is dissolved by its own terms, with Jimmy receiving all remaining principal.[41]

The 1986 Trust gives Bob the discretion to establish trust shares for Chris and Bobby.[42] If Bob grants Chris and Bobby trust shares, they would then have the right to serve as trustee and to designate the successor trustee of their respective trust shares upon reaching the age of twenty-five.[43]

### 2. The BST Trust

Mimi formed the BST Trust on October 3, 1986, as a means to transfer her assets to Bob and Jimmy.[44] Upon Mimi's death in 1990, Article Six of the BST Trust established two residuary trusts, one for each of Bob and Jimmy.[45] Jimmy's residuary trust received title to a house in Rehoboth, Delaware,[46] and Bob's residuary trust took title to Mimi's

---

[40] *Id.* Art. 5 ¶ A.

[41] *Id.* Art. 5 ¶ B.

[42] *Id.* Art. 2 ¶ B.

[43] *Id.*

[44] *See* BST Trust. The BST trust was amended and restated several times. The version executed on August 16, 1988 remains in effect.

[45] *Id.* Art. 6.

[46] Jimmy Dep. Tr. at 49:20–51:17.

residence in Wilmington, Delaware.[47]  The Wilmington residence later sold for $545,000, with the proceeds from the sale forming the principal of Bob's residuary trust.[48]

The BST Trust granted Jimmy both the trust income from his residuary trust and the right to withdraw on the trust principal.[49]  By contrast, the BST Trust granted Bob the trust income only and named Chris and Bobby or their issue as beneficiaries entitled to the residuary trust's principal upon Bob's death.[50]  At some point after Mimi's death, Bob gifted a total of $75,000 of the BST Trust principal to Chris and Bobby.[51]

Plaintiffs allege that assets of the BST Trust were used in connection with three different transactions that Plaintiffs view as suspicious.

The first challenged transaction concerns a loan from the BST Trust to NKS in 1993.[52]  According to Bob, the loan was originally in the amount of $400,000 and accrued interest at 6.5%.[53]  By 2008, NKS's records reflected that the Company owed $176,955

---

[47] Trial Tr. at 572:5–11 (Bob); *id*. at 230:10–13 (Chris).

[48] JX-888 at 1.  For simplicity, at times this decision refers to Bob's residuary trust and the BST Trust as one in the same.

[49] BST Trust Art. 6 ¶ A(1)–(2).

[50] *See id.* Art. 6 ¶ B (1)–(2); Trial Tr. at 571:17–20 (Bob).

[51] Trial Tr. at 574:4–8 (Bob); PTO ¶ 65.

[52] PTO ¶ 64.

[53] JX-1070 at 2.  NKS's financial statements reflect that the loan was accruing interest at 8% and not 6.5%, *see* JX-150 at 14, but this factual discrepancy is immaterial to the outcome of this decision.

9

plus interest on the loan.[54] When the Company paid interest, those payments were made directly to Bob.[55]

The second challenged transaction occurred in January 1997, when Bob used BST Trust funds to purchase a home in Florida (the "Florida Condo").[56] In April 2000, Bob sold the Florida Condo and used the proceeds from that sale to purchase a different condo in his name.[57]

The third challenged transaction involves the acquisition of a private airplane. In April 2000, the BST Trust loaned $119,000 to Ty Air, LLC ("Ty Air").[58] Bob is the sole owner, controller, and member of Ty Air, which he formed for the purpose of holding title to an airplane.[59] Using the $119,000 it received from the BST Trust, Ty Air purchased a twin-engine Beechcraft Baron airplane.[60] The loan was interest free with no maturity or repayment date, but the BST Trust does have a lien filed with the Federal Aviation Authority on the plane for the $119,000 it loaned to Ty Air.[61] Bob did not inform Chris or

---

[54] Trial Tr. at 584:22–585:10 (Bob).

[55] *Id.* at 589:6–15 (Bob). It is unclear whether Chris and Bobby were fully apprised of the loan. Bob testified that he did not inform Chris or Bobby of the loan, *id.* at 587:19–588:12 (Bob), but Chris testified that NKS "had a note payable to the BST Trust in 1995" and that he learned of the loan in 1996, *id.* at 230:14–20 (Chris).

[56] JX-912; Trial Tr. at 574:9–13 (Bob).

[57] JX-912; Trial Tr. at 575:9–576:4 (Bob).

[58] Trial Tr. at 577:16–19 (Bob); *see also* JX-37.

[59] *Id.* 578:15–20 (Bob); PTO ¶ 67.

[60] Trial Tr. at 578:21–579:3 (Bob).

[61] *Id.* at 580:3–16 (Bob); PTO ¶ 68.

Bobby of this transaction and, to date, Ty Air has not paid back any part of the loan it received from the BST Trust.[62]

### D.  Prior Family Turmoil

Chris began working for NKS in 1992 as an on-premise coordinator for its customers.[63]  By 1999, Chris had worked his way up to executive vice president and was promoted to Company president in 2005.[64]  While managing NKS, Chris made many bad decisions that even he acknowledges were serious mistakes, and which the court need not rehash for the present purposes.[65]  It suffices to say that Chris' conduct threatened NKS's financial health and affected NKS's relationships with its lenders.

The Company's two lenders at the time, Wilmington Trust and Wilmington Savings Fund Society ("WSFS," and with Wilmington Trust, the "Lenders"), approached Bob in December 2008 to voice "concerns regarding the finances of the company and Chris' behavior."[66]  Specifically, the Lenders were worried about NKS's cash flow and leverage, that "cash flow was coming out of the company for noncompany items," that NKS's checking account was overdrawn by about $1.5 million, and that NKS's line of credit was

---

[62] Trial Tr. at 580:17–24 (Bob).

[63] Chris Dep. Tr. at 10:2–13.

[64] *Id*. at 11:19–12:17.

[65] Trial Tr. at 179:14–180:13, 183:21–184:3 (Chris); *see also id.* at 518:23–519:18 (Bob) (describing the Company's financial state under Chris' leadership); *see also* JX-413 ¶¶ 2–3 (listing Chris' transgressions while running the Company).

[66] Trial Tr. at 518:11–20 (Bob).  Though Chris had assumed primary control over the operations of the Company, the Lenders approached Bob to see if he "was in a position to help them," due to Chris' mismanagement.  *Id*. at 517:12–14, 518:15–20 (Bob).

overdrawn by about $3 million.[67]  NKS's status with the Lenders threatened its relationship with Anheuser-Busch.[68]

To protect NKS, in December 2008, Bob issued a written consent on behalf of the 1986 Trust in his capacity as its trustee, removing Chris as a director of NKS.[69]  For the same reason, in January 2009, Bob issued another written consent on behalf of the 1986 Trust removing Chris as an officer of NKS and placing him on a leave of absence from the Company.[70]  Then, in May 2009, Bob amended the portion of his will designating Chris as the sole future beneficiary of the NKS stock held by the 1986 Trust, naming instead Bobby's and Chris' issue while leaving out Chris.[71]

In February 2009, NKS received a letter from Wilmington Trust declaring NKS in default and demanding repayment of its outstanding debt.[72]  Negotiations between NKS and the Lenders resulted in a March 19, 2009 Forbearance Agreement that granted NKS a longer runway to service its debt.[73]

---

[67] *Id.* at 518:23–519:18 (Bob).

[68] *Id.* at 520:7–15 (Bob) ("It was my understanding that [the Lenders] were going to close our accounts. . . .  We would have been in default of our agreements and probably immediately terminated by Anheuser-Busch.").

[69] JX-115 at 1.

[70] *Id.* at 2–3.

[71] JX-260 at 1–2; Trial Tr. at 544:5–12 (Bob).

[72] JX-230 ¶ N, Trial Tr. at 675:22–676:17 (Forbes).

[73] JX-230; *see also id.* at Recitals ¶¶ A–D, F–I, K; *id.* ¶ 1; Trial Tr. at 676:24–677:6 (Forbes).

Between December 2008 and March 2009, Bob contributed significant amounts of his personal wealth to keep the Company afloat.[74] While the Lenders were threatening to declare a default and close NKS's accounts, Bob contributed almost $1.2 million to the Company.[75] His contributions included the entirety of his 401(k), his liquidated investments, including securities and cash in his personal bank accounts, and the cash value of his life insurance policy.[76] In exchange for these funds, Bob received a promissory note from the Company.[77] Separate from this note, Bob further contributed funds to NKS through a lien on the Florida Condo and by selling his boat, accepting an $80,000 pay cut, and contributing additional cash to help NKS meet payroll obligations.[78]

In June 2009, NKS filed a complaint against Chris alleging breaches of fiduciary duty pertaining to his actions as an NKS director and president.[79] Chris responded by filing a complaint against Bob in his capacity as trustee of the 1986 Trust alleging breaches of fiduciary duties and seeking specific performance of Bob's alleged promise to transfer control of the family business to Chris.[80]

---

[74] JX-316.

[75] *Id.* Schedule A; Trial Tr. at 521:17–20 (Bob).

[76] JX-316 Schedule A; Trial Tr. at 522:3–13 (Bob).

[77] JX-316.

[78] Trial Tr. at 523:13–524:5 (Bob).

[79] C.A. No. 4640-VCP, Dkt. 1, Verified Compl.

[80] C.A. No. 4677-VCP, Dkt. 1, Verified Compl.

In June 2011, Chris pled guilty to four felonies pertaining to illegal campaign contributions funneled through NKS and related tax violations.[81] Later that month, Chris, Bob, NKS, and several family trusts executed a Settlement Agreement and Mutual General Release (the "Settlement Agreement").[82] Under the Settlement Agreement, the parties agreed to dismiss all litigation pending among them.[83]

Under the Settlement Agreement, Chris agreed to "release[], acquit[], and forever discharge[] [Bob], NKS," and other related parties "of and from any and all . . . obligations of any nature whatsoever, whether present or future, whether known or unknown," which Chris "now has, or can, shall or may have at any time against any of them . . . on or by reason of any matter, cause or thing whatsoever arising or occurring from the beginning of the world through the date of this Agreement."[84]

None of the other Plaintiffs were parties to the Settlement Agreement or the release.[85]

Throughout and following the roughly two years of litigation between Chris, Bob, and NKS, the Lenders extended forbearance of NKS's debt eight times, culminating finally

---

[81] JX-413.

[82] JX-417.

[83] *Id.* ¶ 1(c)(ii).

[84] *Id.* ¶ 3(a).

[85] *See id.* at Recitals (defining "CJT Parties" as Chris and two of his personal trusts; lacking reference to Bobby or any of Chris' or Bobby's children).

14

in a Seventh Amendment to the Second Amended Forbearance Agreement, dated April 25, 2012.[86]

### E.     The Refinancing

Neither the Forbearance Agreement nor Bob's substantial personal contributions served to restore NKS's financial health.  By February 2011, NKS's relationship with its Lenders was strained.[87]  Shortly after Bob and NKS settled the litigation with Chris, the Lenders informed Bob that he "had 120 days to sell the company or refinance it."[88]

Unwilling to sell the Company, Bob opted to refinance NKS's debt (the "Refinancing").[89]  To accomplish this goal, NKS began refinancing discussions with Bank of America, N.A. ("Bank of America").  Negotiations resulted in a Credit Agreement dated

---

[86] *See* JX-504; *see also* JX-251, JX-352, JX-395, JX-397, JX-442, JX-464, JX-499 (amending and restating the Forbearance Agreement).

[87] Trial Tr. at 527:15–18 (Bob); *see also id.* at 527:18–23 (Bob); *id.* at 692:14–18 (Forbes); JX-487 at 2–3 (Feb. 16, 2012 email from Lenders' counsel noting the "herculean efforts" needed to avoid foreclosure); JX-514 (June 4, 2012 email from Lenders' counsel threatening "dire consequences" if NKS fails to obtain funding when the Forbearance Agreement matures on June 29, 2012).

[88] Trial Tr. at 528:6–12 (Bob) ("[W]hen I finally settled the litigation with Chris[,] . . . that was the trigger for them . . . .  And they had a meeting, a luncheon meeting at Wilmington Trust, and it was at that meeting that they told me I had 120 days to sell the company or refinance it.").

[89] *Id.* at 528:13–529:15 (Bob) (describing Bob's unsuccessful attempt to find additional equity investors without selling the company "at a fire sale," which Bob "couldn't let . . . happen," prompting Bob to instead focus his efforts on refinancing); *see also id.* at 683:13–21 (Forbes) (explaining NKS's efforts at finding equity investors that "came to naught.").

July 13, 2012.[90]  Bank of America conditioned the transaction memorialized in the Credit Agreement on NKS obtaining a capital infusion of $5 million.[91]

To infuse NKS with $5 million in capital, Bob, Jimmy, and a longtime Tigani family friend Leo Renzette,[92] negotiated a series of transactions (the "399 Transactions").[93]  Bob, Jimmy, and Renzette first formed a holding company called 399 Associates, LLC (the "399 LLC").[94]  Jimmy and Renzette each contributed $2.5 million.[95]  The 399 LLC then used those funds to purchase a warehouse space in Milford, Delaware, from NKS for $2.5 million.[96]  This added $2.5 million in cash to the NKS balance sheet and allowed the 399 LLC to take title to the Milford property.[97]

Around this time, Bob had obtained a property at 399 New Churchman's Road in New Castle, Delaware (the "399 Property") from a Chapter 7 bankruptcy proceeding.[98]

---

[90] JX-565.

[91] Trial Tr. at 684:6–13, 685:23–686:20 (Forbes); *see* JX-454 (December 14, 2011 email from Bank of America inquiring about NKS's capital structure to ascertain debt-to-equity ratios of the Company); JX-565 § 4.01(a)(xxiii) (requiring "executed copies" of the notes issued by Bob to NKS as a condition to closing).

[92] Renzette also previously served as controller and CFO of NKS.  JX-778 ¶¶ 5–6.

[93] Trial Tr. at 418:16–17 (Director); JX-488.

[94] JX-515; *see* JX-488 ¶ 1.

[95] Trial Tr. at 418:8–10 (Director); *see* JX-488 ¶ 1.

[96] JX-488 ¶ 1.

[97] Trial Tr. at 418:12–13 (Director).

[98] Chris had purchased the 399 Property for NKS in 2007 through a separate entity, My Pal, LLC.  *Id.* at 249:5–8 (Chris).  It was through the My Pal, LLC bankruptcy that Bob purchased the 399 Property.  *Id.* at 418:2–7 (Director); *see* JX-488 ¶¶ 1, 3.

Bob contributed the 399 Property to the 399 LLC.[99]  He then borrowed $2.5 million from the 399 LLC and contributed it directly to NKS, adding another $2.5 million in cash to the Company's balance sheet.[100]

The 399 Transaction closed on July 12, 2012, when Bob wired the final $2.5 million to NKS.[101]  The Refinancing closed the next day.[102]  Had NKS not received the $5 million capital infusion, the Lenders could have foreclosed and forced a sale of the Company.[103]

## F.    The Stock Issuance

At a May 2012 meeting, the NKS board discussed the 399 Transactions and contemplated that Bob's resulting $2.5 million investment in NKS would be in the form of equity, for which Bob would be issued NKS stock.[104]  Those details were not finalized, and Bob was not issued stock at the time he made the $2.5 million investment.[105]

During the year-end audit conducted in the first quarter of 2013, NKS's accountants discovered that there was no accounting for Bob's $2.5 million capital contribution.  "[I]t was sitting on the company's books" but "wasn't really classified as debt because there [were] no loan documents," and "wasn't classified as stock because there[] [was] no stock

---

[99] JX-488 ¶¶ 1, 3.

[100] *See* Trial Tr. at 418:13–15 (Director); JX-488 ¶ 4.

[101] *See* JX-562 at 1.

[102] JX-565; *see also* JX-563 (July 13, 2012 closing statement).

[103] Trial Tr. at 774:6–775:8 (Massey).

[104] *See* JX-507 (noting "additional stock issued for $2.5" in Bob's handwritten notes from the May 18, 2012 NKS board meeting).

[105] *See* Trial Tr. at 628:8–631:15 (Bob).

17

issuance."[106]  Under the Credit Agreement, Bank of America would not allow NKS to take on additional debt.[107]  NKS thus needed to classify Bob's contribution as equity by issuing him a commensurate amount of NKS stock.[108]

Using inputs from the Company, the accountants calculated that Bob's $2.5 million contribution was worth approximately 75 to 78 shares of NKS common stock.[109]  An issuance of this amount would bring Bob's total equity stake to over 50% and result in a change in control under the Anheuser-Busch Equity Agreement.[110]  The issuance therefore required Anheuser-Busch's approval, which the Company received by a letter dated March 7, 2013.[111]  The Board then voted to approve the issuance of 75 shares.[112]  Bob did not participate in the vote.[113]  On March 7, 2013, NKS issued Bob 75 shares of NKS common stock dated as of July 13, 2012 (the "Stock Issuance").[114]

---

[106] *Id.* at 288:1–18 (Bramley).  "The money that they put into the business could be treated either as debt or it could be treated as a capital, you know, sale of stock."  *Id.* at 289:8–10 (Bramley).

[107] *Id.* at 290:16–20 (Bramley).

[108] *Id.* at 290:12–291:5 (Bramley).

[109] *Id.* at 292:3–14, 308:2–23 (Bramley).

[110] *See* JX-580.

[111] *See* JX-598.

[112] *Id.* at 5.

[113] *Id.*

[114] Though NKS did not issue the stock until March 2013, the issuance is reflected in both its 2011 and 2012 financial statements.  *See* JX-967 at 1; JX-466 at 18.  This could be due to the delayed preparation of those statements or in anticipation of the stock issuances or both; the record is unclear.  *See* Trial Tr. at 472:12–17 (Director); *id.* at 296:20–297:8 (Bramley).  Plaintiffs allege that reference to the Stock Issuance in these earlier documents

At trial, Bob credibly testified that his primary concern when entering into the 399 Transactions was to avoid, in his words, NKS going "out of business."[115] He did not anticipate receiving, or ask to receive, NKS stock as a consequence of the transaction.[116] Rather, the Stock Issuance was necessary to account for the capital infusion, which was a condition to the Bank of America refinancing.

## G.    Renewed Family Turmoil

The Tigani family experienced a brief period of relative peace and prosperity following the Refinancing.[117] In September 2013, Chris resumed working for a company he had previously founded, World Class Wholesalers ("World Class").[118] By the fall of 2016, his relationship with his father was better than it had been (as Chris described, it was "[a]s good as . . . can be expected").[119] Bob took several steps to assist Chris and World Class financially.[120] Bob even amended his will in March 2017 to reincorporate Chris into

---

reflect some nefarious motive on Bob's part. The factual issue is of no consequence to this decision.

[115] Trial Tr. at 532:9–10 (Bob).

[116] *Id.* at 532:14–21 (Bob) ("There had been conversations about it. And there were handwritten notes that were shown today that was my handwriting, that I put that down there. But it really wasn't my focus that I would get stock for that money. . . . [I]t was more my focus that I was able to get the money into the company and not whether I was going to get any stock for it.").

[117] *See, e.g.*, *id.* at 534:23–535:7 (Bob) (testifying that his relationship with Chris "was still somewhat strained" but that he "wanted to rebuild a relationship," so he and Chris "started to interact and see each other" and "started to really rebuild [their] relationship").

[118] *Id.* at 201:12–21 (Chris).

[119] *Id.* at 201:22–24 (Chris).

[120] *Id.* at 539:4–23 (Bob).

19

his estate planning.[121] Bobby, who had been employed by the Company full time since 2009, was promoted to brand manager in 2014.[122]

### 1. Chris and Bobby Learn of the Stock Issuance.

By May 2017, World Class was "really on its last legs."[123] Chris' resulting financial position prompted him to begin asking more questions about Bob's estate planning and the family wealth, which was concentrated in NKS stock.[124]

In mid-2017, Chris and Bobby became hopeful that their father would reinstate them as successor trustees of the 1986 Trust.[125] Chris and Bobby set up a meeting with Bob and Steve Director, Bob's estate planning attorney, which took place on June 8, 2017.[126] At the time of the meeting, the successor co-trustees were Director and George Forbes, a director on the NKS board.[127] During this meeting, Bob added Bobby as a third designated successor trustee to the 1986 Trust.[128] After several other meetings with Chris and Bobby that summer, Bob ultimately removed Director and Forbes as successor co-trustees and added family friend Renzette to serve as a successor co-trustee with Bobby.[129] Bob

---

[121] *Id.* at 544:20–545:1 (Bob).

[122] Bobby Dep. Tr. at 24:23–27:10.

[123] Trial Tr. at 545:2–6 (Bob).

[124] *Id.* at 545:4–10 (Bob).

[125] *Id.* at 551:4–8 (Bob); *id.* 209:5–210:7 (Chris).

[126] *See* JX-690; Trial Tr. at 545:17–546:6 (Bob).

[127] Trial Tr. at 495:7–11 (Director); *see also* Forbes Dep. Tr. at 10:15–11:20.

[128] JX-693.

[129] JX-710.

believed that the Renzette/Bobby pair would ensure that "the Tigani family not only own but control NKS."[130]

Whatever hope Chris and Bobby felt at the beginning of the summer of 2017 was tempered by events that unfolded in the months that followed. It was at the June 2017 estate planning meeting that Chris and Bobby first learned that the 1986 Trust was no longer the majority stockholder of NKS as a consequence of the Refinancing and Stock Issuance.[131] In Chris' words, he and Bobby felt "left in the dark."[132]

Chris believed that the Stock Issuance was designed to free Bob from the restrictions imposed by Pal and Mimi through the 1986 Trust and enable Bob to pass NKS stock to what Chris referred to as Bob's "new" family.[133] Chris thought that he, Bobby, and their kids were being "cut . . . out" of the family business and their inheritance.[134] Chris believed that Bob intentionally failed to tell Chris and Bobby about the Stock Issuance—that Bob

---

[130] *Id.*; Trial Tr. at 496:8–13 (Director).

[131] Trial Tr. at 546:7–11 (Bob); *id.* at 205:9–11 (Chris).

[132] *Id.* at 210:5–7 (Chris).

[133] *Id.* at 115:8–18 (Chris) ("And what was intended to happen with that stock . . . is that it was intended to go to new trusts that Mr. Director and Mr. Forbes and his wife would control, with new beneficiaries, and my brother and I and our children were discarded and disregarded and thrown away like we're his old family. He's got a new family. His new step-grandkids work at NKS. I don't begrudge those guys anything. But they certainly shouldn't be taking the share of my children and my niece and my grandparents."); *id.* at 99:19–101:6 (Chris) (testifying as to his view that the very purpose of the 1986 Trust was to prevent Bob from transferring a controlling interest in NKS to his stepfamily).

[134] *Id.* at 116:1–5 (Chris) (testifying as to his belief that Bob's wife was "going to decide who the successor trustees are of the company and [Bob is] going to cut us out, that's why we had to file a lawsuit and that's why we're here before the Court").

21

did not want his sons to know about the Stock Issuance.[135]  Bob admitted that they "never talked about it"[136] but denied that he intentionally concealed the information.[137]

The revelation of the Stock Issuance further stirred Chris to seek more information about the 1986 Trust, Bob's stake in NKS, and Bob's operation of NKS.  Chris set up several additional meetings with his father over the summer of 2017.[138]  According to Bob, Chris became "very aggressive" during these meetings, "hounding and pounding on [Bob] to make changes" to his estate.[139]  Bobby "hardly ever said anything," allowing Chris to run these meetings and to demand that Bob amend his successor trustee designations for the 1986 Trust.[140]

---

[135] Plaintiffs point to a number of Bob's statements at trial to support this theory.  *See* Dkt. 451, Pl.'s Christopher Tigani Corrected Opening Post-Tr. Brief ("Pls.' Post-Tr. Opening Br.") at 34–36.  Specifically, they note that Bob relied on two methods of informing Plaintiffs:  first, that they would be notified upon Bob's death; and second, that Bob would have told them had they asked.  Bob Dep. Tr. at 179:11–181:7, 657:3–21; Trial Tr. at 534:16–22, 546:16–547:7 (Bob).

[136] Trial Tr. at 546:16–547:3 (Bob) ("It's not something that I needed or wanted to hide from them.  It's just something that never got discussed."); *see also id.* at 534:16–22 (Bob) ("I had no real plans to keep it a secret forever.  I guess the fact that nobody asked me.  But I've always been very open and honest with everyone.  If Bobby had said 'Hey, did this happen or did that happen,' I certainly would have told him.  It was not something -- there was no reason to hold it a secret.").

[137] *Id.* at 547:1–3 (Bob).

[138] The meetings "were sometimes individually with Chris and [Bob] at lunch, and maybe with [Bob] and [Chris] and [Bobby] at lunch together."  Bob Dep. Tr. at 100:3–15.

[139] Trial Tr. at 551:8–10 (Bob).

[140] *Id.* at 554:1–14 (Bob).

22

### 2.     Chris and Bobby Learn of Bob's Employment Contract and a Contemplated Recapitalization.

When Chris and Bobby pressed Bob for more information during the summer of 2017, they discovered that Bob had a lifetime employment contract with NKS.[141] On December 29, 2016, the contract was approved by written stockholder consents executed by Bob and by the NKS Board comprising Bob, Forbes, and Director.[142]

The employment contract provides that, as of January 1, 2017, NKS would employ Bob as Chairman of the Board "for so long as he is able and willing to render services," with a guaranteed salary and annual cost-of-living increases.[143] It further provides that upon Bob's death, NKS would pay Bob's wife "the balance of [Bob's] salary not paid to him for the year of his death."[144] After that year, NKS would pay Bob's wife "an annual payment equal to one-half of the annual salary paid to [Bob] during the year of his death," allowing for annual cost-of-living increases.[145]

Chris contends that, at the time this employment contract was executed, the Company was "so profitable that it was going to start issuing dividends."[146] From Chris' perspective, "every dollar that the company spends" on Bob's employment contract and death benefits represents a decision to spend Company money rather than to issue those

---

[141] *Id.* at 118:6–18 (Chris).

[142] JX-665.

[143] *Id.*

[144] *Id.* at 1.

[145] *Id.*

[146] Trial Tr. at 118:19–21 (Chris).

funds as dividends to the 1986 Trust.[147] Bob explained that his lifetime salary and the death benefits for his wife were necessary "because all of [his] money . . . that [he] had, [he] put into the company and [he] no longer had it for [his wife]."[148]

Chris and Bobby also learned that summer that Bob was considering converting NKS into an S-Corporation, which necessitated a recapitalization of voting and nonvoting stock (the "Recapitalization").[149] The Recapitalization would have facilitated Bob's estate planning goals by reducing the taxable portion of his estate. The Recapitalization would have resulted in the issuance of 144 shares of nonvoting stock to the 1986 Trust and 256 shares of nonvoting stock to Bob personally and would have had no dilutive impact on either the voting power or the economic value of the shares held by the 1986 Trust.[150] NKS amended its Certificate of Incorporation to allow for the Recapitalization, though it never actually occurred;[151] none of the proposed changes to NKS's capital structure were implemented.[152]

### 3. Chris and Bobby Send Bob Demand Letters.

In September 2017, Chris and Bobby sent a series of letters to Bob in his capacity as trustee of the 1986 Trust, demanding information and action as beneficiaries of the 1986

---

[147] *Id.* at 118:19–119:11 (Chris).

[148] *Id.* at 650:10–17 (Bob).

[149] *Id.* at 61:2–7, 65:17–24 (Sparks).

[150] JX-671 at 13–14; Trial Tr. at 69:3–74:2 (Sparks).

[151] JX-671; Trial Tr. at 79:1–11 (Sparks).

[152] *See* PTO ¶ 109.

Trust.[153] The first letter, sent on September 18, 2017, nominally sought to investigate the 2012 Stock Issuance but requested broad categories of documents reaching beyond its stated purpose.[154] The second letter, sent on September 25, 2017, demanded that NKS refrain from issuing any additional stock while the information requests remained pending.[155] The second letter also threatened to seek injunctive relief preventing the Company from issuing stock to its President, Paul Ruggiero.[156] Bob confirmed receipt of the September 17 and 25 letters, but neither Bob nor NKS provided information to Chris or Bobby in response to the demands.[157]

Bobby then sent a second set of communications to Bob and NKS seeking information as director of NKS. On September 28, 2017, Bobby emailed Bob seeking information as an NKS director concerning an equity issuance to Ruggiero.[158] Bobby had learned that NKS wanted to designate Ruggiero as manager of the Anheuser-Busch Equity Agreement, which would require Ruggiero to hold a minimum 10% equity interest in

---

[153] Trial Tr. at 212:3–12 (Chris).

[154] JX-719 at 2, 4–5.

[155] JX-721 at 1–2.

[156] *Id.* at 2.

[157] *See* JX-720; JX-722; JX-744; Trial Tr. at 641:2–8, 642:9–14 (Bob).

[158] JX-729.

NKS.[159] On October 3, 2017, Bobby forwarded his email to the Board, requesting additional documents pertaining to Ruggiero's employment as NKS's president.[160]

Although the second set of communications were nominally from Bobby, Chris admitted at trial that he assisted Bobby in drafting them in an attempt to "up the pressure because we need[ed] information."[161]

### 4. NKS Terminates Bobby's Employment.

The September and early October communications from Chris and Bobby raised concerns at NKS. The Company's management team grew worried that Chris was manipulating Bobby to obtain confidential information to secure himself employment, to take over the Company, or for some other purpose.[162]

Management's concerns escalated in early October due to events involving Total Wine & More ("Total Wine"), a significant distributor for NKS.[163] On October 3 and 4, 2017, Chris put Bobby in contact with David Trone, CEO and Chairman of Total Wine.[164] According to Chris, the goal was to help Bobby promote his assigned brand to improve

---

[159] JX-659 at 1–2. To ensure that its product managers' and wholesalers' incentives were aligned, Anheuser-Bush required that brand managers hold a minimum 10% equity interest in NKS. *See* Anheuser-Busch Equity Agreement §§ 2(b); Trial Tr. at 433:9–434:15 (Director) (describing the approval process under the Anheuser-Busch Equity Agreement for transferring NKS stock); Bob Dep. Tr. at 579:16–580:5.

[160] JX-742; *see* JX-977.

[161] Trial Tr. at 211:22–212:12 (Chris).

[162] *Id.* at 310:20–311:4 (Ruggiero); JX-754 ("[W]e both know it's not Bobby. Further he needs to go through proper channels, not work behind our [manager's] back.").

[163] Trial Tr. 214:3–4 (Chris).

[164] *See* JX-1101; Trial Tr. 213:18–214:20 (Chris).

Bobby's standing in the eyes of NKS's management.[165] In an October 3, 2017 email, Chris asked Trone to display an NKS product in his stores on Bobby's behalf and Trone agreed.[166] The next day, Chris alerted Trone that Bobby would later send an email to NKS management copying Trone.[167] Chris told Trone that he had written the email from Bobby and asked Trone to "reply all and just say something like . . . Bobby, happy to help. You can count on Total Wine."[168] Later that day, Trone replied to the email from Bobby (written by Chris) as Chris had requested: "happy to help."[169]

The communications between Bobby and Trone were a performance and NKS's leadership team was the audience, though the performance was neither convincing nor well received. The agreement with Trone was not consistent with the then-current business strategy for NKS's brands.[170] And the NKS management team suspected that Chris was directing the show. In a private exchange with Bob concerning Bobby's email, Ruggiero wrote: "Normally you would say way to go. Under the circumstances do we really want [Chris] pulling the puppet strings on Bobby. Hard to justify this type of display space for these brands in our largest customer."[171] Bob responded: "I'm still reluctant to start

---

[165] Trial Tr. 214:10–215:12 (Chris); JX-1101 at 2.

[166] JX-1101 at 2.

[167] JX-1085 ("You are going to get a cc: email from my brother . . . . I wrote it and it references you.").

[168] *Id.* (ellipses in original).

[169] JX-776 at 1.

[170] *See* JX-754, at 1.

[171] JX-754 at 1.

shooting down everything he's doing."[172]  To that, Ruggiero said:  "[W]e both know it's not Bobby.  Further he needs to go through proper channels, not work behind our [key account manager's] back."[173]

Ruggiero concluded that Bobby's circumvention of the proper channels represented a serious disruption at NKS,[174] and human resources concluded that Chris' involvement constituted a breach of confidentiality.[175]

On October 4, 2017, Ruggiero recommended that Bobby be placed on administrative leave.[176]  In response to Ruggiero's recommendation, Bob asked that the Company "hold off" to allow tensions to de-escalate.[177]

Tensions did not de-escalate.  As October progressed, Bobby continued to behave in a way that NKS management viewed as disruptive.  Rumors circulated through NKS that Chris and Bobby were orchestrating a corporate takeover, causing employees to fear that their jobs were at risk.[178]  Bob emailed Bobby a warning not to involve Chris in NKS-

---

[172] *Id.*

[173] *Id.*; *see* Trial Tr. at 315:20–22 (Ruggiero).

[174] *See* JX-754.

[175] JX-759 (October 4, 2017 email from NKS's V.P. of Human Resources to Bob explaining:  "I reviewed the handbook this morning and the violation would fall under breach of trust and confidential company information.  A conflict of interest would also exist when a member of an employee's immediate family is involved in situations.  If Bobby, Jr. is disclosing confidential company information to his brother Chris who is not an employee and could cause potential damage to N.K.S. that is clearly a conflict of interest.").

[176] JX-760; JX-761; Trial Tr. at 325:3–15 (Ruggiero).

[177] JX-762.

[178] JX-781 at 1.

28

related business or communications on October 9, 2017, but that did not allay concerns.[179] By October 23, 2017, Ruggiero's worries regarding Bobby's behavior prompted him to request that Bobby not attend corporate events.[180]

On November 2, 2017, Chris requested that Bobby download a software application called "TeamViewer" that would allow Chris to remotely link to Bobby's NKS computer,[181] which contained the Company's confidential information.[182] The next day, on November 3, 2017, Chris and Bobby filed this lawsuit.[183]

Immediately after receiving notice of the lawsuit, Bob issued a unanimous written consent as stockholder of NKS removing Bobby from the Board.[184] At a meeting the following day (that Bobby did not attend), the NKS board voted to put Bobby on administrative leave and to gradually scale back his salary.[185] At the meeting, Bob expressed concerns about leaving Bobby and his family without any income or health insurance but abstained from the vote.[186]

---

[179] *See* JX-797.

[180] JX-810; *see* Trial Tr. at 310:7–23 (Ruggiero).

[181] JX-818; JX-819; Trial Tr. at 322:5–8 (Ruggiero).

[182] Trial Tr. at 324:8–10 (Ruggiero).

[183] *See* Dkt. 1, Verified Compl. For Breach of Fiduciary Duty, Breach of Trust, and Removal of Trustee and Appointment of Successor Trustee (Compl.).

[184] *See* PTO ¶ 114; JX-828; Trial Tr. at 565:10–13 (Bob).

[185] PTO ¶¶ 115–18; Trial Tr. at 706:13–708:2 (Forbes); *id.* at 327:3–8 (Ruggiero).

[186] Trial Tr. at 325:20–327:11 (Ruggiero).

## H. This Litigation

Plaintiffs filed this action on November 2017, asserting claims against Bob for breach of his duties as trustee of the 1986 Trust. Plaintiffs amended the complaint in June 2019, adding claims under the BST Trust.[187] Plaintiffs also added NKS as a nominal defendant. The Amended Complaint asserts the following causes of action:

- Count I against Bob for breach of trust, seeking removal of Bob as trustee of the 1986 Trust;

- Count II against Bob for breach of trust, seeking removal of Bob as trustee of the BST Trust;

- Count III against Bob for breach of his fiduciary duties as trustee of the 1986 Trust and the BST Trust, including by accepting and concealing the Stock Issuance, firing Bobby, failing to preserve the BST Trust's assets, failing to establish trust shares for Chris and Bobby under the 1986 Trust, and failing to disclose trust information to Chris and Bobby;

- Count IV for declaratory judgment that Bob breached his duties with respect to both trusts, that Chris and Bobby are entitled to trust shares of the 1986 Trust, that Bob's successor trustee designations for the 1986 Trust are void and unenforceable, and that Bob is a conflicted fiduciary and his actions as trustee are thus null and void;

- Count V seeking to void the 2013 and 2016 NKS Certificate of Incorporation amendments authorizing the Stock Issuance and the Recapitalization; and

- Count VI for Plaintiffs' attorneys' fees and costs incurred in connection with this action.[188]

---

[187] Dkt. 258, Verified First Am. Compl. for Breach of Fiduciary Duty, Breach of Trust, Removal of Trustee and Appointment of Successor Trustee ("Am. Compl.").

[188] *Id.* ¶¶ 71–95.

## I. The Stock Repurchase

On November 12, 2019, NKS repurchased the 75 shares of the Company's stock that were issued to Bob in 2012 (the "Stock Repurchase").[189] Bob received just under $2.7 million for the 75 shares,[190] which allowed him to repay the $2.5 million loan from the 399 LLC.[191] Bob did not participate in the Board's vote on the Stock Repurchase.[192]

The Company's value increased substantially between 2012 and 2019. The $2.7 million purchase price, however, was calculated based on NKS's valuation at the time of the 2012 Stock Issuance (roughly $37,000 per share), not the 2019 value of the stock (roughly $97,000 per share).[193] The price thus represented a bargain for the Company.[194]

The Stock Repurchase brought NKS's stock distribution back down to pre-2012 levels. The 1986 Trust currently holds 72 shares of NKS stock and Bob's personal trust holds 53 shares.[195]

## II. LEGAL ANALYSIS

Plaintiffs' many claims against Bob can be grouped into two categories. First, Plaintiffs claim that Bob, as trustee of the 1986 Trust and the BST Trust (together, the "Trusts"), breached his fiduciary obligations to them as beneficiaries of those trusts.

---

[189] PTO ¶ 45.

[190] *Id.* ¶¶ 107–08.

[191] *See* Trial Tr. at 330:8–12 (Ruggiero).

[192] *Id.* at 329:17–19 (Ruggiero).

[193] *See id.* at 330:13–20 (Ruggiero); *id.* at 440:16–20 (Director).

[194] *Id.* at 709:12–16 (Forbes).

[195] PTO ¶ 109.

Second, Plaintiffs claim that Bob, as a director of NKS, breached his fiduciary obligations to them as stockholders of NKS. This decision addresses Plaintiffs' claims in that order.

## A. Breach of Fiduciary Duties as Trustee

To prevail on a claim for breach of fiduciary duty in the trust context, a plaintiff must demonstrate that she is owed fiduciary duties and that the defendant breached those duties.[196] This decision begins with an overview of the duties Bob owed to Plaintiffs and then analyzes whether Bob breached those duties.

### 1. Nature of the Duties Owed

Under default principles of Delaware law, a trustee owes fiduciary duties to a beneficiary.[197] Those duties are defined in part by the beneficiary's status under a trust instrument. The Trusts designate only one current beneficiary: Bob.[198] Chris and Bobby are presumptive remainder beneficiaries.[199] Their interests are "presumptive" because their right to trust principal is subject to Bob's power of appointment.[200] Bob may leave

---

[196] *Hardy v. Hardy*, 2014 WL 3736331, at *11 (Del. Ch. July 29, 2014); *see also* 12 *Del. C.* § 3581(a) ("A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust.").

[197] *See* 12 *Del. C.* § 3301(d); *id.* § 3301(h)(2)(a).

[198] *See* 1986 Trust Art. 4; BST Trust Art. 6 ¶ B; *see also* JX-731 at 0:30:55–0:34:34 (transcription of a September 29, 2017 phone call between Chris, Bobby, Bob, and Bennett, in which Bennett explained that Bob is the sole income beneficiary during his lifetime).

[199] *See* Trial Tr. at 50:20–52:9 (Bennett). Their children are contingent successor remainder beneficiaries. *See* 1986 Trust Art. 4 ¶ E (giving Bob the power of appointment to distribute the trust assets, upon his death, "only . . . in favor of [Bobby], or [Chris], and/or the issue of [Bobby], or [Chris]"); BST Trust Art. 6 ¶ B(2) (giving Bob the power of appointment to distribute the trust assets, upon his death, "in favor of [Bob's] children . . . or in favor of the issue of [Bobby] and/or [Chris]").

[200] *See* 12 *Del. C.* § 3547(b)(1) (defining "presumptive remainder beneficiary" as "a beneficiary who, as of any date and but for the exercise of any power of appointment,

the Trusts' principal to all of the Plaintiffs equally or to any one of them to the exclusion of the others.[201]

Under Delaware law, remainder beneficiaries hold only a vested interest in the remainder of an estate but do not enjoy the present right to possess or control trust assets.[202] Although Delaware law does not speak directly to the rights of presumptive remainder beneficiaries, it stands to reason that such rights are no more extensive than those of remainder beneficiaries with vested interests. As with remainder beneficiaries, the rights of presumptive remainder beneficiaries must correspond to their interests in and can be modified by the trust instrument.[203]

---

would receive income or principal of the trust if the trust were to terminate as of that date (without regard to the exercise of any power of appointment) or, if the trust does not provide for its termination, a beneficiary who would receive or be eligible to receive distributions of income or principal of the trust if all of the beneficiaries currently receiving or eligible to receive distributions of income or principal were deceased").

[201] *See* 1986 Trust Art. 4 ¶ E; BST Trust Art. 6 ¶ B(2); *see also In re Tr. FBO duPont Under Tr. Agreement Dated August 4, 1936*, 2018 WL 4610766, at *15 (Del. Ch. Sept. 25, 2018) (describing presumptive remainder beneficiaries as "*potential* beneficiaries" because their "rights, ultimately, were dependent upon [the settlor's] exercise of the [limited power of appointment]" (emphasis added)).

[202] *Blackstone v. Chandler*, 130 A. 34, 35 (Del. Ch. 1925) (applying rule that a remainder beneficiary's right to benefit from a trust is "vested in interest, but not in possession" and noting that the death of the life beneficiary "mark[s] the point in time when possession should end for the first beneficiary and begin for the [remainder beneficiary]").

[203] *Restatement (Second) of Trusts* § 128 (Am. L. Inst. 1959) [hereinafter *Restatement Second*] ("The extent of the interest of the beneficiary of a trust depends upon the manifestation of intention of the settlor . . . ."); *Restatement (Third) of Trusts* § 49 cmt. a (Am. L. Inst. 2007) [hereinafter *Restatement Third*] ("The interests of beneficiaries are usually prescribed with reasonable clarity by the express provisions of a trust. . . . The terms of the trust in these matters will be respected and given effect unless contrary to public policy."); *see, e.g., Wilm. Tr. Co. v. Carpenter*, 75 A.2d 815, 821 (Del. Ch. 1950) (refusing to allow trustee to hold trust assets for remainder beneficiaries upon life

Relevant to this dispute, and subject to the strictures of the Trust instruments, Bob owes to Plaintiffs four categories of duties that a trustee generally owes to remainder beneficiaries.

First, Bob owes a duty to preserve the Trusts' property.[204] This duty flows from Plaintiffs' presumptive interests in future rights to assets of the Trusts, and stems from Bob's duty "act as [a] reasonable and prudent person in managing the trust."[205] The duty to preserve may be modified by a trust's terms,[206] and both Trusts modify this duty by granting Bob the discretion to invade the trust principal in limited circumstances—where

---

beneficiary's "renunciation of her right to the income" because the language of the trust entitled "subsequent beneficiaries" to accelerate their right to the income "on the premature termination of [the current] interest"); *see also N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2011603, at *2 (Del. Ch. May 7, 2010) (noting that Chris' interest in the 1986 Trust was "more attenuated" than that of a current beneficiary, and *his status does not give him "the same rights under a trust as its primary beneficiaries*" (emphasis added)); *Stegemeier v. Magness*, 1996 WL 549832, at *3 (Del. Ch. Sept. 20, 1996) (distinguishing rights of current versus remainder beneficiaries and holding that remainder beneficiaries "have no standing to assert the breach of fiduciary duty claim to restore the allegedly diverted profits from the sale of" trust property).

[204] *See Restatement Second* § 232 cmt. b.

[205] *McNeil v. McNeil*, 798 A.2d 503, 509 (Del. 2002); *see also* 12 *Del. C.* § 3302(a) ("When investing . . . and managing property for the benefit of another, a fiduciary shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use . . . ."); *Law v. Law*, 753 A.2d 443, 447 (Del. 2000) ("[T]rustees are held to a prudent investor standard in the management and investment of a trust's assets or property." (citing *Wil. Tr. Co. v. Coulter*, 200 A.2d 441 (1964)).

[206] *Restatement Second* § 176 cmt. d; *see In re Living Tr. of Wilson*, 2012 WL 5359293, at *1 (Del. Ch. Oct. 11, 2012) (noting that "under the terms of the Trust, it was unlikely that any contingent beneficiaries would take, because the Trust gives an unfettered right to [current beneficiaries and trustees] to demand the distribution of their respective shares of the Trust corpus at any time and for any reason").

34

Bob "deems that the funds available . . . (together with [his] funds from all other sources) are insufficient to provide properly for [his] health, education, maintenance and support."[207] Bob's duty to preserve does not require him to grow or invest the Trusts' principal; both Trusts allow the trustee to "retain all property in the original form received."[208] The 1986 Trust also modifies Bob's duty to preserve by granting him the 5-and-5 Power as its current beneficiary.[209]

Second, Bob owes a duty to act impartially in his treatment of the Trusts' varying beneficiaries, including Plaintiffs.[210] This duty "does not require an equal balancing of diverse interests but a balancing of those interests in a manner that shows due regard for— i.e., is consistent with—the beneficial interests and the terms and purposes of the trust."[211] Bob's duty of impartiality requires only that Bob not act "on the part of one beneficiary at the expense of the others;" it does not mandate equal treatment of beneficiaries with materially different rights and interests.[212] A trustee does not breach its fiduciary duties by

---

[207] *See* 1986 Trust Art. 6; *id.* Art. 8 ¶ A(14); BST Trust Art. 7; *id.* Art. 9 ¶ A(14).

[208] 1986 Trust Art. 8 ¶ A(1); BST Trust Art. 9 ¶ A(1).

[209] *See* 1986 Trust Art. 4 ¶ B.

[210] *Restatement Third* § 79.

[211] *Id.* cmt. c (Am. L. Inst. 2007); *see also id.* cmt. b ("It would be overly simplistic . . . to assume that the interests of all beneficiaries have the same priority and are entitled to the same weight in the trustee's balancing of those interests.").

[212] *NHB Advisors, Inc. v. Monroe Cap. LLC*, 2013 WL 6906234, at *3 (Del. Ch. Dec. 27, 2013) (holding that impartiality does not require perfectly equal treatment so long as a trustee's actions are motivated by the belief that an "outcome was required by his fiduciary duties *to all beneficiaries*" and excluded beneficiaries are unharmed by those actions); *see also Law*, 753 A.2d at 447–49 (holding that trustees do not have a duty to grow a trust's principal and instead may ensure that it is "preserved while producing" income for a current beneficiary).

pursuing a strategy to provide for the current beneficiary while preserving the corpus for a remainder beneficiary.[213]

Third, Bob owes a duty of disclosure, although the scope of that duty is limited given Plaintiffs' remote beneficiary status.[214] Generally, disclosure obligations in the trust context impose a duty to "furnish information to a beneficiary upon reasonable request."[215] Beneficiaries are entitled to information "including the existence of the trust, their status as beneficiaries . . . any significant change in their beneficiary status; and . . . material information needed to protect their interests."[216] The scope of a beneficiary's rights under a trust dictates what constitutes information needed to protect their interests, such that "[t]he terms of a trust may alter the amount of information a trustee must give . . . and persons to whom[ ] it must be given."[217]

Fourth, Bob owes a duty of loyalty limiting his ability to self-deal, although that duty is also modified by the Trusts.[218] As commentators have recognized, "[i]t is well established that a trustee may occupy conflicting positions in handling the trust where the

---

[213] *See Law*, 753 A.2d at 447–48; *Monroe Cap.*, 2013 WL 6906234, at *3.

[214] *See Restatement Third* § 82.

[215] *McNeil*, 798 A.2d at 510.

[216] *Deputy v. Deputy*, 2020 WL 1018554, at *40 (Del. Ch. Mar. 2, 2020).

[217] *Restatement Third* § 82 cmt. a(2).

[218] *See Lynch v. Barba*, 2018 WL 1613834, at *4 (Del. Ch. Apr. 3, 2018) (noting that "the fiduciary duties a trustee traditionally owes at common law include the duty of loyalty and the rule against self-dealing").

trust instrument contemplates, creates, or sanctions the conflict of interest."[219]  In this case, the Trusts create and therefore sanction conflicts of interests by appointing Bob as the trustee and current income beneficiary.  Likewise, when the Settlors created the 1986 Trust and continued to fund it with NKS stock, Bob worked at NKS and personally owned NKS stock. [220]  Conflicts of interests inherent in this ownership scheme were therefore contemplated at the formation of the 1986 Trust.

### 2.    The 1986 Trust

Plaintiffs claim that Bob breached his duties as trustee of the 1986 Trust through a variety of transactions and attendant non-disclosures.  Seeking a broad array of remedies,[221] Plaintiffs claim that Bob breached his duties:  (a) in connection with the Stock Issuance; (b) by failing to cause NKS to employ Chris and Bobby; (c) by failing to issue trust shares to Chris and Bobby; (d) when selecting successor trustees; and (e) by failing to disclose certain information.

---

[219] John H. Langbein, *Questioning the Trust Law Duty of Loyalty:  Sole Interest or Best Interest?*, 114 Yale L.J. 929, 963 (2005) (quoting *Dick v. Peoples Mid-Ill. Corp.*, 609 N.E.2d 997, 1002 (Ill. App. Ct. 1993)); *see also Restatement Third* § 79 cmt. b(1) (noting that trustees are also life beneficiaries in "many modern trust situations").

[220] Trial Tr. at 508:2–509:12 (Bob); Schedule of Evid. Ex. A, Defs.' Demonstrative Exs. 06–09.

[221] In post-trial briefing, Plaintiffs request the following relief:  (1) Bob's removal as trustee of both the 1986 Trust and the BST Trust, (2) appointment of Bobby and Renzette as trustees of those trusts, (3) judicial dissolution of those trusts and creation of constructive trusts over their assets, (4) a comprehensive accounting of those assets, Bob's transactions as trustee, and the 53 shares of NKS stock that Chris sold to Bob, (5) $21.3 million in damages, (6) attorneys' fees under statutory trust law and the bad faith exception to the American rule, and (7) any other relief the court finds appropriate.  Pls.' Post-Tr. Opening Br. at 94.  At times, Chris also request relief in connection with 53 shares he sold to his father, but that issue falls entirely outside the scope of this litigation.

### a. The Stock Issuance

Plaintiffs claim that Bob breached his duty of loyalty and to refrain from self-dealing by using his power as trustee of the 1986 Trust to cause the Stock Issuance, which Plaintiffs say benefited Bob personally and at the 1986 Trust's expense.[222] Plaintiffs then attempt to invoke the "no further inquiry" rule, which allows a beneficiary to unilaterally void any self-dealing transaction.[223]

Defendants first argue that the Repurchase mooted Plaintiffs' claims challenging the Stock Issuance, and it is tempting to adopt this argument as an easy way to jump the analysis. But the fact that the Stock Issuance was effectively undone does not mean it cannot support a claim for breach under Delaware law.[224] This decision thus cannot avoid Plaintiffs' challenge to the Stock Issuance on grounds of mootness.

Defendants next argue that the Stock Issuance was not a self-dealing transaction as that concept is commonly understood in the context of trust law. Delaware cases addressing self-dealing by a trustee typically involve the transfer or mishandling of trust property or trustee powers.[225] In this case, the 1986 Trust took no action in connection

---

[222] Pls.' Post-Tr. Opening Br. at 57–59.

[223] *See, e.g., Restatement Third* § 78 cmts. b–c (describing the no further inquiry rule as imposing an irrebuttable presumption of voidability to self-dealing transactions).

[224] *See, e.g., Gatz v. Ponsoldt*, 925 A.2d 1265, 1273 (Del. 2007) ("Although the [transaction] was unwound . . . the harm alleged to have resulted from that transaction was not entirely undone . . . .").

[225] *See Hardy*, 2014 WL 3736331, at *8, 10; *Stegemeier*, 728 A.2d at 563; *Mennen v. Wilm. Tr. Co.*, 2015 WL 1914599, at *26 (Del. Ch. Apr. 24, 2015); *see also* George Gleason Bogert, George Taylor Bogert & Amy Morris Hess, *Bogert's The Law of Trusts and Trustees* § 543 (3d ed. 2020) [hereinafter *Bogert*] ("A trustee engages in a divided loyalty

with the Stock Issuance. The transaction, which was between NKS and Bob, did not depend on the exercise of any trustee powers and did not involve any trust property.

In response to this point, Plaintiffs argue that Bob *should have* wielded the voting power of the 1986 Trust to *prevent* the transaction.[226] At times, Plaintiffs suggest that the capital infusion and resulting stock issuance should have been made through the 1986 Trust, asserting what is in essence a version of a usurpation theory but not developing it as such. Although Plaintiffs' theory is underdeveloped, this analysis credits it for the purpose of argument, accepting that Bob's actions or inactions in connection with the Stock Issuance were a form of self-dealing implicating his duties as trustee of the 1986 Trust.[227]

---

transaction if the trustee acts in connection with trust property both on behalf of the trust and for the trustee's personal interests.").

[226] Pls.' Post-Tr. Opening Br. at 60–61 (citing *Harvey v. Leonard*, 268 N.W.2d 504 (Iowa 1978)). *Harvey* is distinguishable. The trust in *Harvey* held a controlling interest in a company, which granted bonuses to certain employees on the condition that those bonuses be used to purchase equity in the company. *Harvey*, 268 N.W.2d at 509. Some of those employees were not family members and thus were not beneficiaries to the trust; others were current beneficiaries and trustees. *Id.* The issuances diluted the trust's controlling interest in the company, was not approved by all trustees, and benefited some trustees and current beneficiaries but not others. *Id.* The court found approval and receipt of the issuance to be a violation of defendant trustees' duties of loyalty because it benefited them over other equal beneficiaries and the trust itself, though it ultimately denied relief based on laches. *Id.* at 512, 515. In this case, Bob is the sole current beneficiary and the sole trustee of the 1986 Trust; Plaintiffs' interests are not on par with Bob's. Also, the finding of bad faith was central to the *Harvey* court's conclusion, a distinguishing fact for reasons discussed below.

[227] *See, e.g., Kelly v. Fuqi Int'l, Inc.*, 2013 WL 135666, at *6 (Del. Ch. Jan. 2, 2013) ("Delaware courts have the discretion to 'look to the underlying substance of a pro se litigant's filings rather than rejecting filings for formal defects . . . .'" (ellipses in original) (quoting *Sloan v. Segal*, 2008 WL 81513, at *7 (Del. Ch. Jan. 3, 2008))).

Although this decision assumes that the Stock Issuance was an act of self-dealing, it does not follow that Plaintiffs may void the transaction under the no-further-inquiry rule.

Under common law, the no-further-inquiry rule permits a beneficiary to unilaterally void a self-dealing transaction regardless of whether the trustee can show that the action was taken in good faith, the terms of the transaction were fair, and it did not benefit the trustee at the beneficiaries' expense.[228] The no-further-inquiry rule is a "conclusive presumption of invalidity"[229] that flows from a trustee's duty of loyalty.[230]

It is unclear whether Delaware has adopted the no-further-inquiry rule and, if so, to what degree. Only one Delaware case mentions the concept, and only then to observe that a trust instrument eliminated the presumption.[231]

To the extent that Delaware law recognizes the no-further-inquiry rule, it is a byproduct of the duty of loyalty and, like that duty, "may be modified by the terms of the trust."[232] As one commentator has observed, "[i]t is well established that a trustee may occupy conflicting positions in handling the trust where the trust instrument contemplates, creates, or sanctions the conflict of interest."[233] Generally, "[w]hen the settlor selects a conflicted person to serve as trustee, such as a family member who is also a beneficiary,

---

[228] *Restatement Third* § 78 cmts. A–b.

[229] *See* Langbein, *supra* note 219, at 931.

[230] *Restatement Third* § 78 cmt. b.

[231] *See Mennen*, 2015 WL 1914599, at \*24 & n.254 (citing *Restatement Third* § 78 cmt. b).

[232] *See Restatement Third* § 78 cmt c(2); *see also Lynch*, 2018 WL 1613834, at \*4 ("Under Delaware law, a trustee's powers are subject to fiduciary duties *unless modified by the terms of the trust*" (emphasis added)).

[233] Langbein, *supra* note 219, at 963; *see Restatement Third* § 79 cmt. b(1).

the court infers that the settlor intended a commensurate waiver of the [no-further-inquiry] rule, even if the trust instrument does not spell out that term."[234]

In this case, the terms of the 1986 Trust and the context in which it was formed reveal that the Settlors intended to waive the no-further-inquiry rule. The 1986 Trust creates and sanctions obvious conflicts of interest by making Bob both the current beneficiary and the trustee. Moreover, the 1986 Trust was formed to hold shares of NKS Stock, and when the Settlors formed and funded the 1986 Trust with NKS stock, Bob worked at NKS and personally held 53 shares.[235] This combination of facts is rife with conflicts resulting from Bob's positions as (a) trustee, (b) beneficiary of a trust holding NKS stock, and (c) an employee, manager, and personal stockholder of NKS. In this scenario, it would be unreasonable to conclude that the Settlors intended to vest Plaintiffs, as presumptive remainder beneficiaries, with the right to unilaterally invalidate any self-dealing actions undertaken by Bob under the no-further-inquiry rule.

This decision thus declines to apply the no-further-inquiry rule and turns to the merits of Plaintiffs' claim that Bob breached his duty of loyalty as trustee in connection with the Stock Issuance.

The duty of loyalty "requires a trustee to administer the trust solely for the interest of the beneficiary and exclude all selfish interests and all consideration of the interests of

---

[234] Langbein, *supra* note 219, at 963.

[235] Trial Tr. at 508:2–509:12 (Bob); PTO ¶¶ 20–23.

41

third persons."[236] A beneficiary may show that a trustee breached that obligation by acting in his own self-interest "[i]nstead of evaluating what was in the best interests of [a] [t]rust."[237] Thus, Bob can be held liable for breaching his duty of loyalty if the record supports a finding that Bob failed to act in the best interests of the 1986 Trust.[238]

The record does not support a finding that Bob breached his duty of loyalty in connection with the Stock Issuance. Plaintiffs claim that Bob issued NKS stock to himself to "seize" a controlling interest in NKS, to deprive Plaintiffs of control of NKS, and to circumvent the restrictions of the 1986 Trust and provide for his "new" family through estate planning.[239] None of this is true. In reality, the Stock Issuance was an after-the-fact accounting of a much-needed capital infusion. The capital infusion helped NKS consummate the Refinancing and avoid financial ruin. The Refinancing set the Company

---

[236] *Hardy*, 2014 WL 3736331; *see also* Bogert § 543 ("Perhaps the most fundamental duty of a trustee is the trustee's duty of loyalty to the beneficiaries, . . . . The trustee must administer the trust with complete loyalty to the interests of the beneficiary, without consideration of the personal interests of the trustee or the interests of third persons."); *Restatement Second* § 170(i) (noting that a trustee "is under a duty to the beneficiary to administer the trust solely in the interests of the beneficiary").

[237] *Paradee v. Paradee*, 2010 WL 3959604, at *10 (Del. Ch. Oct. 5, 2010).

[238] Where, as here, "a trust's beneficiaries are selected or authorized by the settlor to serve as trustee," claims for breach of the duty of loyalty are often analyzed as claims for breach of the duty to act impartially. *Restatement Third* § 78 cmt. c(2); *see also id.* § 79 cmt. b. Because the Plaintiffs' beneficial interests were in no way affected by the Stock Issuance, as discussed *infra*, viewing the alleged breach through the lens of the duty of impartiality confuses rather than clarifies the analysis.

[239] Pls.' Post-Tr. Opening Br. at 57.

on a course back to financial health and was thus in the best interests of NKS.[240] By extension, the Stock Issuance was in the best interests of the 1986 Trust.[241]

The Stock Issuance did not harm Plaintiffs' interests in the 1986 Trust; indeed, the Stock Issuance did not affect Plaintiffs' interests in the 1986 Trust at all. While the Stock Issuance had the effect of diluting the 1986 Trust's ownership percentage of the Company until the Repurchase, this at most diluted the 1986 Trust's voting power exercised by Bob as trustee.[242] It had no impact on Plaintiffs, who have no present rights to the trust's voting power.[243]

Accordingly, Bob did not breach his fiduciary duties as trustee of the 1986 Trust in connection with the Stock Issuance.[244]

### b. No Right to Employment

Plaintiffs claim that they each have a right to work at NKS and that Bob's failure to maintain or secure employment for them at NKS constitutes a breach of his duty as trustee of the 1986 Trust.[245]

---

[240] *See* Trial Tr. at 528:6–12, 532:9–10 (Bob), *id.* at 774:6–775:8 (Massey).

[241] Plaintiffs do not argue that the terms of the Stock Issuance were unfair (and they would likely lack standing to assert such a claim for the reasons discussed *infra* Section II.B).

[242] *See* 1986 Trust Art. 4 ¶ A; *id.* Art. 8 ¶ A(4).

[243] *See id.* Art. 5.

[244] To the extent that Plaintiffs challenge the Recapitalization as a breach of fiduciary duty, such a claim fails because the transaction was never consummated, and it would have had no dilutive effect whatsoever on the 1986 Trust's voting stake in the Company in any event. *See* PTO ¶ 109.

[245] Pls.' Post-Tr. Opening Br. at 61–63. Based on the premise that Plaintiffs have a right to employment, Plaintiffs also claim that Bob breached his duties to them by "hiring his wife's family and her grandchildren" and not them, by allowing the NKS Board to reduce

As support for this argument, Plaintiffs rely solely on general statements about the Settlors' hope that Chris and Bobby work at the Company.[246] But the fact that a settlor held a hope concerning a beneficiary does not convert such hope to an enforceable right. For that hope to give rise to a right, it must be memorialized in the trust instrument.[247]

There is no language in the 1986 Trust that requires the trustee to cause NKS to employ Chris and Bobby.[248] In fact, at its inception, the Settlors did not vest the 1986 Trust with enough NKS shares to empower its trustee to cause NKS to do anything.[249] The

Bobby's pay and terminate his employment, by securing benefits for Bob's wife through Bob's employment contract, and through Ruggiero's employment contract. *See* Pls.' Post-Tr. Opening Br. at 57. These theories all seem to be based on Plaintiffs' erroneous contention that the 1986 Trust entitles Plaintiffs to employment at NKS and thus fail for the same reasons.

[246] *See* Pls.' Post-Tr. Opening Br. at 62–63.

[247] *See, e.g.*, *Wilson*, 2012 WL 5359293, at *1–2 (finding that where a trust allowed either of its two current beneficiaries and co-trustees to demand distribution of their entire trust share "at any time and for any reason," one trustee could not prevent the other from demanding distributions because the settlors' intent to maintain trust property for future generations was not written in the trust instrument; holding that their duties as trustee "was to the Trust *as written:* not to carry out the cryptic intent of [their] parents, unexpressed in the Trust instrument"); *Grant v. Bessemer Tr. Co. of Fla., Inc. ex rel. Grant*, 117 So. 3d 830, 833–36 (Fla. Dist. Ct. App. 2013) (finding after extensive evidentiary findings that a settlor desired for his son to continue working for the settlor's company but not to advance to an executive or management position, that language to this effect in a codicil to settlor's will was largely precatory and conferred a right to an employment opportunity but not a guarantee of lifetime employment, and that the beneficiary-son did not have the right to compel employment based on the trust language, despite his father's expressed wishes).

[248] *See* Trial Tr. 670:24–671:4 (Bobby) (testifying that "there's nothing that says that" the trustee of the 1986 Trust "has an obligation to hire" Chris and Bobby at NKS).

[249] *See* 1986 Trust Schedule A. Even where a trust instrument expressly directs the employment of a named individual, such provisions are "ordinarily intended merely to promote the efficient administration of the trust rather than to confer a benefit on the [individual]" and are thus often interpreted as discretionary. *See Restatement Third* § 48 cmt. b.

44

Settlors thus could not have intended for the 1986 Trust to ensure the employment of the trust's beneficiaries.

Plaintiffs rely on *In re Estate of Winston*,[250] but that decision offers no support for their position. *Winston* concerned the marital trust of Harry Winston, which held roughly $69 million in assets including a controlling stake in the settlor's eponymous jewelry business.[251] Harry's two sons, Ronald and Bruce, were entitled to co-equal shares of the remaining trust principal upon the death of Winston's wife.[252] The sons disputed the appropriate means of distributing the trust principal. Ronald, who was CEO of the company, wanted to maintain control over the company and thus desired to distribute the shares in kind.[253] Bruce had been fired from his position at the company.[254] Because his brother had ceased distributions, share ownership would not result in any cash flow to Bruce.[255] Bruce thus desired to sell the shares and believed that the estate would obtain greater value if the shares were sold together.[256]

Although it was clear that "Harry envisioned that the business would be continued after his death" and that "Harry intended his son Ronald to continue as an officer and director of the companies," the "dominant intent" of the settlor evidenced by the trust

---

[250] 631 N.Y.S.2d. 999 (Surr. Ct. 1995).

[251] *Winston*, 631 N.Y.S.2d at 1000.

[252] *Id.*

[253] *Id.* at 1001, 1003.

[254] *Id.* at 1007.

[255] *Id.* at 1002–03.

[256] *Id.* at 1007.

instrument was "maintenance of a fair income" and "equal division of the value of his estate between his two sons."[257] The court therefore held that the testamentary documents did not require an in-kind distribution.[258] The court concluded that it was more advantageous to both beneficiaries to sell the whole controlling interest and thus ordered the trustees to sell the business and distribute the proceeds.[259]

*Winston* does not stand for the proposition that a trustee must ensure that beneficiaries remain employed by a family business, as Plaintiffs argue. It stands for the opposite proposition. Although the court found that the settlor intended for Ronald to continue as a director and officer of the company, the court did not order an outcome that allowed Ronald to retain his employment. Likewise, although the court found that the settlor desired to benefit his children equally, the court did not order Ronald to hire Bruce. The court ordered an outcome that was likely to deprive Ronald of his continued employment in order to maximize the value of the trust assets.[260] *Winston* in no way supports a conclusion that the court must order Bob to wield the voting power of the 1986 Trust to cause NKS to hire Chris and Bobby.

---

[257] *Id.* at 1005–06.

[258] *Id.* at 1005–07.

[259] *Id.* at 1007.

[260] *Winston* is further distinguishable in that Ronald and Bruce held a current right to income from their trust. By contrast, Plaintiffs are presumptive remainder beneficiaries with no current right to income or other financial benefits.

46

Because Plaintiffs have no right to be employed by NKS under the 1986 Trust, Bob did not breach his duty as trustee by allowing Bobby's termination and by refusing to guarantee his sons' employment with the Company.

### c. No Right to Trust Shares

Plaintiffs claim that Chris and Bobby have a present right to receive trust shares, a right they contend accrued when Chris and Bobby each turned 25.

Plaintiffs rely on Article Two of the 1986 Trust, which grants Chris and Bobby the right to serve as trustees of their own trust shares and to designate their own successor trustees only "after trust shares are established for" their benefit and "upon reaching age 25."[261] They claim that this language obligated Bob to "divide[] the 1986 Trust into two trust shares for Bobby and Chris at age 25."[262]

Plaintiffs misread Article Two and Article Five of the 1986 Trust. Article Five requires the trustee to establish trust shares for Chris and Bobby if and only if Bob has not exercised his personal power of appointment,[263] a power exercised upon his death.[264] Article Two, in turn, applies only "after trust shares are established" for Chris and

---

[261] 1986 Trust Art. 2 ¶ B.

[262] Pls.' Post-Tr. Opening Br. at 20.

[263] 1986 Trust Art. 5 ("After the death of [Bob], to the extent that the power of appointment . . . is not effectively exercised . . . ."). Bennett confirmed this reading of the 1986 Trust at trial. *See* Trial Tr. at 51:4-23 (Bennett).

[264] *See du Pont Weymouth v. Wilm. Tr. Co.*, 1991 WL 148808, at *4 (Del. Ch. Aug. 2, 1991) (noting that a beneficiary's power of appointment "could take effect only upon her death" where the trust "provides that for her power of appointment to become exercisable, [her] life estate must terminate, *i.e.*, she must first die").

Bobby.[265] Plaintiffs emphasize the phrase "[d]espite the foregoing" as evidence of a mandate in Article Two—a mandate that is unsupported by Delaware law and the plain language of the trust.[266] The phrase "[d]espite the foregoing" merely preserves Chris' and Bobby's right to appoint or serve as trustee *after* their trust shares are established and *if* they are over 25 years old—it does not compel Bob to establish those trust shares.[267] The mandatory language ("shall") of the provision refers only to rights triggered upon the issuance of trust shares and does not impose upon its trustee any obligation to actually issue those shares before a triggering event.[268] Bob is thus under no obligation to issue trust

---

[265] 1986 Trust Art. 2 ¶ B. Plaintiffs cite to *Paradee* for the proposition that the Court has already interpreted Article Two consistent with Plaintiffs' interpretation, Pls.' Post-Tr. Opening Br. at 20, but that case is distinguishable. The trust article in *Paradee* did not involve trust shares and was triggered upon the death of the settlor, who had passed. *Paradee*, 2010 WL 3959604, at *5 ("[A]fter my . . . death, and upon reaching age 30, my grandson . . . shall be entitled to serve as trustee hereunder . . . .").

[266] *See* Pls.' Post-Tr. Opening Br. at 20–21.

[267] *See* 1986 Trust Art. 2 ¶ B. At trial, Bennett testified that she does not interpret the 1986 Trust as obligating Bob to grant trust shares and that she views such action as unlikely to occur because the shares would constitute a taxable gift. Trial Tr. at 60:3–7 (Bennett) ("If Bob were to create separate trust shares for Chris and Bobby during his lifetime, when they turned age 25, would that be a taxable gift? A. Yes."); *id.* at 60:15–20 (Bennett) ("[C]reating the trust for them would be a taxable gift if they were funded. Bob has a vested interest in the trust, we're way past the disclaimer period, so anything would be a taxable gift at this point."). In fact, maintaining the status quo of the trust until Bob's death was the only way to ensure the avoidance of taxes levied on the 1986 Trust's property. *Id.* at 61:2–7 (Bennett) ("[T]he primary purpose of the generation-skipping trust . . . is to avoid taxes. And . . . the way it was done, won't be included in Bob's estate when he passes away. So it won't be subject to estate tax."); *see also* JX-731 at 24 ("I also think the way it's written there's just no chance that your father could ever set up those trusts for you and your brother or your kids, during his lifetime.").

[268] *See* 1986 Trust Art. 2 ¶ B.

shares, and Chris and Bobby did not obtain rights under Article Two solely by their reaching the age of twenty-five.

Therefore, Bob did not breach his duty as trustee by failing to establish trust shares for Chris and Bobby when they turned twenty-five.

### d. No Right to Remove the Trustee or Select the Successor Trustee

Plaintiffs ask the court to exercise the discretionary power afforded under 12 *Del. C.* § 3327 to remove Bob as trustee.[269]  They also ask the court to set aside Bob's designations as to his successor trustees due to alleged conflicts of interest.[270]

Section 3327 authorizes this court to remove a trustee in five scenarios, only one of which—Section 3327(c)—is relevant given the holdings of this decision. [271] Section 3327(3)(c) authorizes the removal of a trustee in the absence of a breach of trust if there exists "[h]ostility between the trustee and beneficiaries that threatens the efficient

---

[269] Pls.' Post-Tr. Opening Br. at 78–79.

[270] *Id.* at 79–83.

[271] *See* 12 *Del. C.* § 3327 (permitting this court to remove a trustee if:  "(1) The trustee has committed a breach of trust; or (2) A lack of cooperation among co-trustees substantially impairs the administration of the trust; or (3) The court, having due regard for the expressed intention of the trustor and the best interests of the beneficiaries, determines that notwithstanding the absence of a breach of trust, there exists:  a. A substantial change in circumstances; b. Unfitness, unwillingness or inability of the trustee to administer the trust properly; or c. Hostility between the trustee and beneficiaries that threatens the efficient administration of the trust").  Sections 3327(1), (2), (3)(a), and (3)(b) do not apply because Bob has not breached any of his duties as trustee of the 1986 Trust; Bob is the only trustee so a lack of co-operation could not impair the trusts' administration; Plaintiffs do not allege any substantial change in circumstances; and Plaintiffs do not allege any facts to suggest Bob is either unfit, unwilling, or unable to administer trust property.

administration of the trust."[272]  Plaintiffs argue that Bob's hostility towards them justifies his removal under this provision.[273]

Generally speaking, removal of a trustee is an extreme form of equitable relief that "should 'be exercised sparingly.'"[274]  The court is reticent "to remove a trustee who has been chosen by the settlor"[275] or to intervene "[w]here the terms of the trust provide a method" for trustee appointment and vacancy-filling.[276]  For removal to be warranted under Section 3327(3)(a), "the friction or hostility must be of such a nature as to make it impossible for the trustee to properly perform his duties."[277]  Mere disagreement or a "lack of confidence" by the beneficiaries "is not a sufficient ground for removal."[278]

To demonstrate that Bob is hostile in the way required by Section 3327(3)(c), Plaintiffs recast their arguments concerning Chris' and Bobby's entitlement to employment.  They contend that Bob is hostile because of his "financial retaliation against Bobby and Chris."[279]  As discussed above, however, Bob has no obligation as trustee to

---

[272] 12 *Del. C.* § 3327(3)(c).

[273] Dkt. 458, Pl.'s Post-Trial Reply Br. ("Pls.' Post-Tr. Reply Br.") at 40.

[274] *McNeil*, 798 A.2d at 513 (quoting *In re Catell's Estate*, 38 A.2d 466, 469 (Del. Ch. 1944)); *see also Smith v. Biggs Boiler Works Co.*, 91 A.2d 193, 199 (Del. Ch. 1952) ("The mere fact that there is discord between the parties to a trust will not ordinarily warrant a court in removing a trustee."); *In re Heizer Corp.*, 1988 WL 58272, at *21 (Del. Ch. June 6, 1988) (noting that "removal of a trustee is a severe form of relief . . . and the power of removal should be exercised sparingly").

[275] *Bogert* § 527.

[276] *McNeil*, 798 A.2d at 513.

[277] *du Pont v. Wilm. Tr. Co.*, 2017 WL 4461132, at *8 (Del. Ch. Oct. 6, 2017).

[278] *Vredenburgh v. Jones*, 1980 WL 6786, at *2 (Del. Ch. June 13, 1980).

[279] Pls.' Post-Tr. Opening Br. at 78–79.

ensure Chris' and Bobby's employment by NKS. Moreover, during the Board meeting during which NKS terminated Bobby's employment, Bob demonstrated his affection for his son by seeking to ensure Bobby continued to receive some financial support post-termination.[280] In the end, despite the years of insidious litigation, Bob credibly testified that he wants his family to heal.[281] These facts cut against any finding of hostility.

Plaintiffs also ask the court to invalidate Bob's designations for successor trustee. But the 1986 Trust gives Bob absolute "power to designate fiduciaries."[282] The trust instrument gives Plaintiffs no power to select trustees unless and until they are issued trust shares, which has not occurred.[283] Because Plaintiffs lack the right under the plain language of the 1986 Trust to veto or replace Bob's designated successor trustees, Plaintiffs' challenge to Bob's appointments fail.

### e. No Breach of Disclosure Obligations

Plaintiffs allege that Bob had an obligation to disclose but failed to disclose information concerning: (i) the Stock Issuance, (ii) NKS's employment contracts, (iii) changes to the designation of successor trustees, and (iv) the Recapitalization.

---

[280] *See* Trial Tr. at 325:20–327:11 (Ruggiero).

[281] *Id.* 567:17–568:5 (Bob).

[282] 1986 Trust Art. 2 ¶ C.

[283] *See id.* Art. 2 ¶ B.

As discussed above, beneficiaries are entitled to material information that is necessary to protect their interests, and thus the scope of a trustee's disclosure duty tracks the scope of a beneficiary's interests under a trust.[284]

Bob did not breach his obligations by failing to disclose the Stock Issuance. As discussed above, the Stock Issuance in no way affected Plaintiffs' rights under the 1986 Trust. Thus, knowledge of the issuance was not necessary to protect Plaintiffs' interests.

Bob did not breach his obligations by failing to disclose changes in designations as to his successor trustee. As discussed above, Plaintiffs lack the right under the 1986 Trust to veto or replace Bob's designated successor trustees, and disclosure of those designations was not necessary to protect Plaintiffs' interests under the 1986 Trust. Moreover, a successor trustee cannot take action that impacts Plaintiffs' rights under the 1986 Trust. Bob has the right to remain trustee until his death or incompetence.[285] If Bob is incapacitated but still alive, he remains the sole current beneficiary of the trust.[286] If Bob passes, the 1986 Trust requires the successor trustee to distribute its assets pursuant to his will to Chris, Bobby, or their issue.[287] In the absence of a valid will, the trustee is directed to establish trust shares for Chris and Bobby in residuary trusts to which they will then

---

[284] *See supra* notes 214–17 and accompanying text. Chris acknowledged this in a September 29, 2017 phone call with Bob, Bobby, and Bennett. *See* JX-731 at 0:52:51 (responding to a comment that remainder beneficiaries typically must affirmatively request information, asking "[d]on't [Delaware courts] require the trustee to give beneficiaries information, enough information that they can protect their rights?").

[285] 1986 Trust Art. 2 ¶ A.

[286] *Id.* Art. 4 ¶ A.

[287] *Id.* Art. 4 ¶ E.

have the right to appoint or serve as trustee.[288]  Therefore, the moment at which a successor

trustee becomes trustee due to Bob's death is also the moment at which Chris' and Bobby's

right to trust shares under Article Five vest, giving them the authority to remove a trustee

of which they do not approve.[289]

Bob did not breach his obligations by failing to disclose the Recapitalization, which

never occurred, and which would have had no impact on Plaintiffs' limited rights under

the 1986 Trust in any event.  As contemplated, the Recapitalization would have caused

NKS to issue additional stock *pro rata* so as not to impact proportional ownership of the

Company.  It also would have involved Bob acting in his capacity as trustee solely to

approve the transaction by voting the 1986 Trust's NKS stock, a right Plaintiffs do not

have.[290]

Bob did not breach his obligations by failing to disclose his lifetime employment

contract, his wife's death benefits, or Ruggiero's employment contract.  The NKS

employment contracts had no impact on Plaintiffs' limited rights under the 1986 Trust, and

---

[288] *Id.* Art. 5.

[289] Plaintiffs support this argument with the *Restatement's* contention that "a trustee's duty to provide information to beneficiaries *may* apply when there are . . . significant changes in trustee circumstances, including changes in the identities, number, or roles of trustees." Pls.' Post-Tr. Reply Br. at 13 (emphasis added and omitted) (quoting *Restatement Third* § 82 cmt. d).  The *Restatement* offers no support for the assertion that a change in the *successor* trustee sufficiently warrants notification where the trustee himself remains unchanged, particularly where the successor trustee has no discretionary authority affecting Plaintiffs.

[290] *See* JX-667 at 5.

53

the 1986 Trust was not a party to any of these agreements.[291]  To the extent these agreements implicated any self-dealing by and among the directors and officers of NKS, it had nothing to do with the 1986 Trust itself and is insufficient to trigger any information rights Plaintiffs may have as presumptive remainder beneficiaries.

### 3.  The BST Trust

Plaintiffs contend that Bob violated his duties as trustee of the BST Trust by stripping the trust of its principal in self-dealing transactions and by failing to disclose information about the trust's transactions.  Plaintiffs specifically allege that Bob breached his fiduciary duties by loaning BST Trust funds to NKS, using BST Trust funds to purchase the Florida Condo, and loaning BST Trust funds to Ty Air for the purchase of an airplane.[292]

Bob did not breach his fiduciary duties when loaning BST Trust funds to NKS.  The loan was an investment on behalf of the BST Trust that earned interest.[293]  The BST Trust authorized Bob to invest its principal, including "[t]o make loans" from those funds.[294]  Although the interest payments on the loan were made by NKS directly to Bob, Bob is entitled to trust income as the current income beneficiary.[295]  Bob therefore did not breach

---

[291] *See* JX-666; JX-977.

[292] *See* Pls.' Post-Tr. Opening Br. at 72–73.

[293] Trial Tr. at 584:22–24, 586:4–7 (Bob).

[294] BST Trust Art. 9 ¶¶ A(3), (11).

[295] *See* 12 *Del. C.* § 61-406(a) ("An amount received as interest . . . must be allocated to income . . . ."); Trial Tr. at 588:19–589:15 (Bob).

his fiduciary obligations under the BST Trust in issuing the loan to NKS or accepting the interest payments.

By contrast, the Florida Condo and Ty Air transactions are problematic. Bob admitted that he used funds from the BST Trust to purchase the Florida Condo in the trust's name for his personal benefit and not as an investment of trust principal,[296] that proceeds from the sale of the Florida Condo "were rolled into the purchase of another property" titled in Bob's name, and that those proceeds are still absent from the BST Trust.[297] He also admits that he did not inform Plaintiffs of these actions.[298]

Bob likewise admitted that he caused the BST Trust to loan money to Ty Air, an entity he owns and controls entirely,[299] and that he caused Ty Air to use the BST Trust's funds to purchase an airplane.[300] Although he filed a lien with the FAA in the name of the BST Trust, he admits that he did not consider this transaction to be an investment on behalf of the BST Trust.[301] Bob further admits that Ty Air has not repaid the loan and that he did not inform Plaintiffs of the loan.[302]

Bob breached his duties as trustee of the BST Trust in connection with both the Florida Condo and the Ty Air transactions. As discussed above, Bob owed Plaintiffs a

---

[296] Trial Tr. at 574:14–21 (Bob).

[297] *Id.* at 575:14–576:4 (Bob).

[298] *Id.* at 576:5–18 (Bob).

[299] *Id.* at 577:16–19, 579:18–580:2 (Bob).

[300] *Id.* at 578:15–24 (Bob).

[301] *Id.* at 577:20–23, 579:10–14 (Bob).

[302] *Id.* 580:17–23 (Bob).

duty to preserve the principal of the BST Trust for their future benefit and restricted Bob's ability to invade the trust principal.[303] While the BST Trust allows Bob to invade the trust principal for his health, education, maintenance, and support, Bob does not contend that he invaded the trust principal for these purposes in connection with the Florida Condo or Ty Air transactions. While the BST Trust also allows Bob to invest trust principal, Bob does not contend that the Florida Condo purchase or the Ty Air loan were investments; rather, Bob used BST Trust principal to fund personal purchases.[304] Bob has thus failed to preserve the BST Trust's principal in breach of his duty as trustee.[305]

Bob does not meaningfully dispute this conclusion. He instead argues that Plaintiffs have not and will not suffer harm because Bob plans to restore all trust principal to the BST Trust at the time of his death with proceeds from his life insurance policy.[306] Effectively, Bob argues that he can ignore his obligations as trustee and the limitations imposed on his ability to invade the trust principal if he promises to pay back the amounts taken upon his death. Setting aside the fact that it would be difficult to enforce this promise against Bob

---

[303] *See supra* notes 204–08 and accompanying text.

[304] Trial Tr. at 574:14–21, 577:16–23 (Bob).

[305] Bob also violated his duty of disclosure, which required him to disclose to Plaintiffs information needed to protect their interests. Depleting the BST Trust of its principal represents a material change that Bob was obligated to disclose. Defendants argue that laches bars Plaintiffs' claims regarding the NKS loan, which this decision finds did not breach Bob's duties in any event. *See* Dkt. 454, Def. Robert F. Tigani, Sr.'s and Nominal Def. N.K.S. Distributors, Inc.'s Joint Answering Post-Trial Br. ("Defs.' Post-Tr. Answering Br.") at 83–84. Defendants do not make a laches argument as to the Florida Condo and Ty Air transactions, which Bob admits he did not disclose to Plaintiffs. *See* Trial Tr. at 576:5–18, 580:21–581:6 (Bob).

[306] Defs.' Post-Tr. Answering Br. at 78–79; Trial Tr. at 652:1–6 (Bob).

when he is dead, the argument would result in a giant loophole to the limitations imposed by the BST Trust. This loophole would do injustice to the interpretive principles guiding this analysis and Delaware law generally. Both the Florida Condo transactions and Ty Air loan invaded the trust principal in violation of Bob's duties and constituted acts of self-dealing.

As a remedy, Plaintiffs ask this court to remove Bob as trustee of the BST Trust and to order damages equal to "the difference between the value of the beneficiary's rights before and after the breach."[307] Delaware law allows this court to exercise its discretion in refusing to remove a trustee, even in the face of breach.[308] Because the severity of removing a settlor-appointed trustee warrants caution and care, the court may refuse to exercise this discretion.[309] In this case, such extreme relief is not warranted. Bob was honest and forthright at trial and showed no signs of bad faith or hostile treatment toward Plaintiffs. And although this decision rejects his promise-to-repay argument, his intent to repay the BST Trust's principal through a life insurance policy does mitigate any finding of bad faith associated with his breach.

As a remedy, Bob must pay back to the BST Trust the principal attributable to the Florida Condo and Ty Air transactions. The Florida Condo was purchased in 1997 for

---

[307] Pls.' Post-Tr. Opening Br. at 89 (quoting *Reed v. Del. Tr. Co.*, 1996 WL 255903, at *2 (Del. Ch. May 7, 1996)).

[308] *See* 12 *Del. C.* § 3327 ("A trustee *may* be removed by the Court of Chancery . . . ." (emphasis added)).

[309] *See Catell*, 38 A.2d at 469–70.

$112,000.[310] The Ty Air loan was in the amount of $119,000.[311] It is possible that portions of this amount were repaid; the record is underdeveloped. Because this decision finds that Bob breached his fiduciary duties by engaging in these transactions, the lack of evidence on this point is construed against him, and Bob is responsible for repaying the full $231,000 amount to the BST Trust.

Plaintiffs seek interest on the $231,000 on the theory that Bob had an obligation to prudently invest the principle of the BST Trust, but Plaintiffs misunderstand their interests and Bob's obligations under the BST Trust for a few reasons. For starters, the BST Trust modified Bob's duty to prudently invest by allowing him to "retain all property in the original form received."[312]

More importantly, any interest accrued from prudent investments would have flowed to Bob as the current income beneficiary and not to Plaintiffs. By way of further explanation, there is usually a tension between the interests of current income beneficiaries and remainder beneficiaries.[313] The latter have a present interest in preserving the trust principal for their future investments.[314] The former seek to maximize a trust's income, which can incentivize risky investment decisions. The duty to prudently invest strikes a

---

[310] JX-912.

[311] JX-37.

[312] BST Trust Art. 9 ¶ A(1).

[313] *See generally Restatement Second* § 181 cmt. c (noting that a trustee generally has a duty to invest money held in trust "so that it will produce an income").

[314] *See generally Equitable Tr. Co. v. Pennetto*, 142 A. 827, 829–30 (Del. Ch. 1928) (describing the common law policy consideration of protecting remaindermen, noting that this protection justifies imposing liability on trustees for failure to preserve trust assets).

58

balance between these interests by allowing a trustee to invest the trust principal but foreclosing a trustee from engaging in overly risky investment decisions that might "endanger[] the integrity of the trust corpus."[315] Bob's failure to invest the trust principal harmed only Bob as the current income beneficiary; any interest generated by investing the principal would have benefited Bob exclusively. Plaintiffs are therefore not entitled to an award of interest on the $231,000.

Accordingly, damages for Bob's breach of the BST Trust are limited to $231,000 to be paid to the BST Trust.[316]

### 4. Attorneys' Fees

Plaintiffs seek recovery of costs and expenses, including attorneys' fees, under the bad faith exception to the American Rule and pursuant to 12 *Del. C.* § 3584.[317]

Plaintiffs are not entitled to attorneys' fees under the bad faith exception. The American rule provides that "each party is generally expected to pay its own attorneys' fees."[318] As a limited exception to the American rule, a court will shift fees for bad faith

---

[315] *DuPont v. Del. Tr. Co.*, 320 A.2d 694, 697 (Del. 1974) (citing *Coulter*, 200 A.2d at 448); *see also Law*, 753 A.2d at 448 (observing that A trustee is thus "expected to preserve principal as their primary strategy for investment" to ensure its availability for remainder beneficiaries).

[316] Defendants argue that certain of Chris' claims are barred by a release executed in the 2011 Settlement Agreement. Because none of the other Plaintiffs are a party to that release but are entitled to relief as beneficiaries of the BST Trust, the remedies imposed on behalf of the BST Trust are unaffected by the release.

[317] Pls. Post-Tr. Opening Br. at 94; Pls. Post-Tr. Reply Br. at 54.

[318] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citing *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005)).

conduct "to deter abusive litigation and to protect the integrity of the judicial process."[319]

"The bad faith exception is not lightly invoked,"[320] and nothing in the record supports a finding that Defendants engaged in bad faith in this litigation.

Plaintiffs also seek attorneys' fees under Section 3584, which allows for an award of attorneys' fees and costs in "a judicial proceeding involving a trust . . . as justice and equity may require."[321]  Those fees may come either from the opposing party or from "the trust that is the subject of the controversy."[322]  To determine the propriety of fee-shifting in trust litigation, this court must balance "the motives to initiate litigation and the benefits litigation confers on a trust."[323]  Where the court believes a party initiated litigation "seeking to prematurely end or otherwise irrevocably alter a trust instrument solely in its own pecuniary interest," the negative effects of such motives "outweigh any incidental trust benefit produced by litigation."[324]

As to the 1986 Trust, because this decision finds no breach of trust, Plaintiffs' litigation produced no benefit and their request for statutory fee-shifting is denied.

---

[319] *Id.* (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998)); *accord Montgomery*, 880 A.2d at 227 (internal quotation marks omitted).

[320] *Ravenswood Inv. Co. v. Winmill & Co.*, 2014 WL 2445776, at *4 (Del. Ch. May 30, 2014) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)).

[321] 12 *Del. C.* § 3584.

[322] *Id.*

[323] *In re Unfunded Ins. Tr. Agreement of Capaldi*, 870 A.2d 493, 498 (Del. 2005).

[324] *Id.* ("Under these circumstances, the balancing of benefit and motive is properly within the broad discretion accorded to the Vice Chancellor.").

As to the BST Trust, this decision does find breach warranting some recovery of attorney's fees and expenses, although a fraction of what is requested commensurate to the level of victory achieved by Plaintiffs. As a rough estimate, Plaintiffs were successful on no more than 10% of their claims. In a generous gesture, this decision grants that 10% of Plaintiffs' total attorneys' fees and expenses shall be paid from the BST Trust.

### B. Fiduciary Duties to NKS

Plaintiffs claim that Bob mismanaged NKS. Any harm resulting from mismanagement of NKS would be a derivative harm to the Company.[325] As established by well-settled Delaware law, claims seeking to address harm to a corporation must be brought on behalf of the corporation.[326] Because Plaintiffs are not stockholders of NKS and do not purport to bring their claims on behalf of the Company, they do not have standing to bring derivative claims.

### III. CONCLUSION

For the foregoing reasons, judgment is entered in favor of Defendants as to all claims related to the 1986 Trust and NKS. Regarding the BST Trust, judgment is entered in favor of Plaintiffs only to the extent that Bob must return the BST Trust principal used in the Florida Condo transactions and the Ty Air loan. Plaintiffs request for fee-shifting is granted to a limited degree. The parties shall confer on a form of order implementing this decision.

---

[325] *See, e.g., Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988).

[326] *See, e.g., Cumming ex. rel. New Senior Inv. Grp., Inc. v. Edens*, 2018 WL 992877, at *11 (Del. Ch. Feb. 20, 2018).

61